## CONNECTICUT ASSOCIATED BUILDERS AND CONTRACTORS ET AL. *v.* CITY OF HARTFORD
### (SC 16062)

Callahan, C. J., and Borden, Berdon, McDonald and Peters, Js.*

---

\* The listing of justices reflects their seniority status on this court as of the date of argument.

Argued April 28—officially released November 16, 1999

*George J. Kelly, Jr.*, with whom were *Eliot B. Gersten* and, on the brief, *Edward F. O'Donnell, Jr.*, for the appellants (plaintiffs).

*Ann F. Bird*, assistant corporation counsel, with whom were *Kevin G. Dubay*, corporation counsel, and, on the brief, *Karen K. Buffkin*, assistant corporation counsel, for the appellee (defendant).

*Donald P. Creston*, and *Jan S. Amundson, Quentin Riegel, Stephen A. Bokat, Robin S. Conrad* and *Sussan Mahallati-Kysela*, pro hac vice, filed a brief for the National Association of Manufacturers et al. as amici curiae.

*Opinion*

PETERS, J. The principal issue in this case is whether nonbidding contractors and subcontractors have standing to challenge a bid specification for a municipal

project that requires the successful bidder to agree to abide by a project labor agreement. Under the terms of a project labor agreement, contractors agree to follow provisions of existing collective bargaining agreements and the unions agree not to strike or disrupt the work of the project. We conclude that the principles governing competitive bidding do not afford standing to the non-bidders in this case to challenge the validity of a project labor agreement.

The plaintiffs are the state chapter of a larger association, Connecticut Associated Builders and Contractors (association), and two subcontractors, Electrical Contractors, Inc., and Rhoan Stewart doing business as Dynamic Electrical Contractor (subcontractors). The members of the association are contractors and subcontractors that, as a matter of philosophy and business practice, are opposed to entering into agreements with construction unions. The plaintiffs' action seeks to enjoin the defendant, the city of Hartford (city), from awarding a contract for the construction of a municipal parking garage (project) on the grounds that a requirement that general contractors and subcontractors on the project agree to be bound by a project labor agreement violates state and local competitive bidding statutes, and the federal and state constitutions. In particular, the plaintiffs alleged in their complaint that the city: (1) violated the "competitive bidding provisions of the Code of the city"[1] and of General Statutes § 10-

---

[1] We presume that the plaintiffs' complaint refers to Hartford Municipal Code, c. XXVIII, § 28-185, as referenced in their brief. That provision provides: "Except for change orders, contracts or orders of an emergency nature, or as otherwise provided in this article, any city funded contracts for materials or services which are to be provided to or in connection with a cooperative or regional school building project pursuant to this article only shall be awarded by the program manager or operator, as applicable, to the lowest responsible qualified bidder who has submitted a bid or proposal in response to a public invitation to bid or request for proposals which has been advertised in a newspaper of general circulation within the city. Additionally, any emergency contracts or orders, and any change orders which would result in an increase in the cost of any contract or order by

the greater of seven thousand five hundred dollars ($7,500.00) or one (1) percent of the contract's original price, which are issued without competitive bid shall first be approved by the city manager. For purposes of this section, the term 'lowest responsible qualified bidder' shall mean that person or entity who or which has ultimately offered the best combination of price, quality, terms and other conditions in respect of the materials or services sought to be acquired."

[2] General Statutes § 10-287 provides: "(a) A grant for a school building project under this chapter to meet project costs not eligible for state financial assistance under section 10-287a shall be paid in instalments, the number and time of payment of which shall correspond to the number and time of principal instalment payments on municipal bonds, including principal payments to retire temporary notes renewed for the third and subsequent years pursuant to section 7-378a or 7-378e, issued for the purpose of financing such costs and shall be equal to the state's share of project costs per principal instalment on municipal bonds or notes, except in cases where the project has been fully paid for, in which case the number of instalments shall be five or, in the case of a regional vocational agriculture center or a cooperative regional special educational facility, shall be one; provided final payment shall not be made prior to an audit conducted by the State Board of Education for each project for which a final calculation was not made prior to July 31, 1983. Grants under twenty-five thousand dollars shall be paid in one lump sum. The Commissioner of Education shall certify to the State Comptroller, upon completion of the issuance of bonds or such renewal of temporary notes to finance each school building project, the dates and amounts of grant payments to be made pursuant to this chapter and the State Comptroller shall draw an order on the State Treasurer upon such certification to pay the amounts so certified when due. All site acquisition and project cost grant payments shall be made at least ten days prior to the principal payment on bonds or temporary notes related thereto or short-term financing issued to finance such site acquisition or project. Annual grant instalments paid pursuant to this section on principal instalment payments to retire temporary notes renewed pursuant to section 7-378a or 7-378e shall be based each year on the amount required to be retired pursuant to said sections, as adjusted for any ineligible project costs, and shall be paid only if at the time such temporary notes are renewed the rate of interest applicable to such notes is less than the rate of interest that would be applicable with respect to twenty-year bonds if issued at the time of such renewal. The determination related to such rates of interest pursuant to this subsection may be reviewed and shall be subject to approval by the Commissioner of Education prior to renewal of such notes. In the event that a school building project is not completed at the time bonds or temporary notes related thereto are issued to finance the project, the certification of the grant payments made pursuant to this section by the Commissioner of Education may be based on estimates, provided upon completion of such project and notifica-

terms of the project labor agreement; (2) exceeded its authority under the municipal code and § 10-287 by instituting the project labor agreement requirement; (3) violated the plaintiffs' state and federal constitutional rights to freedom of speech and association by imposing the project labor agreement requirement and thereby denying the plaintiffs the right to choose not to associate with the unions;[3] and (4) illegally favored bidders already signatory to the collective bargaining

tion of final acceptance to the state, the Commissioner of Education shall adjust and recertify the dates and amounts of subsequent grant payments based on the state's share of final eligible costs.

"(b) All orders and contracts for school building construction receiving state assistance under this chapter shall be awarded to the lowest responsible qualified bidder only after a public invitation to bid, which shall be advertised in a newspaper having circulation in the town in which construction is to take place, except for (1) school building projects for which the town or regional school district is using a state contract pursuant to subsection (d) of section 10-292, and (2) change orders, those contracts or orders costing less than ten thousand dollars and those of an emergency nature, as determined by the Commissioner of Education, in which cases the contractor or vendor may be selected by negotiation, provided no local fiscal regulations, ordinances or charter provisions conflict.

"(c) If the commissioner determines that a building project has not met the approved conditions of the original application, the State Board of Education may withhold subsequent state grant payments for said project until appropriate action, as determined by the commissioner, is taken to cause the building project to be in compliance with the approved conditions or may require repayment of all state grant payments for said project when such appropriate action is not undertaken within a reasonable time.

"(d) Each town or regional school district shall submit a final grant application to the state Department of Education within one year from the date of completion and acceptance of the building project by the town or regional school district. If a town or regional school district fails to submit a final grant application within said period of time, the commissioner may withhold ten per cent of the state reimbursement for such project."

[3] Although the plaintiffs raised constitutional claims in their complaint, they have not pursued them on appeal. See *McLaughlin Ford, Inc.* v. *Ford Motor Co.*, 192 Conn. 558, 559–60, 473 A.2d 1185 (1984) (issues not briefed on appeal deemed abandoned); see also Practice Book §§ 67-4, 61-10. Even if the claims had been argued properly, however, they would not have afforded standing to the plaintiffs for reasons explained in today's companion case, *Connecticut Associated Builders & Contractors* v. *Anson*, 251 Conn. 202, 740 A.2d 804 (1999).

agreements by failing to provide copies of the collective bargaining agreements that are part of the project labor agreement.

The plaintiffs initiated the present action on the day on which bids on the contract were scheduled to be opened. The city moved to dismiss the action on the ground that the trial court lacked subject matter jurisdiction because the plaintiffs lacked standing to raise their claims. That same day, the trial court, *Langenbach, J.*, orally issued a temporary restraining order or injunction that prohibited the city from proceeding with construction until further order of the court. Following a full evidentiary hearing on December 8, 1998, the trial court concluded that the plaintiffs did not have standing to bring this lawsuit. The trial court, therefore, dismissed the complaint and vacated the temporary restraining order or injunction.

The plaintiffs appealed from the trial court's ruling to the Appellate Court. We granted the plaintiffs' subsequent motion, pursuant to Practice Book § 65-2,[4] to transfer the appeal to this court.

On appeal, the plaintiffs contend that the trial court improperly: (1) determined that the association did not have standing; (2) determined that the two subcontractors did not have standing; and (3) excluded the testimony of two witnesses from the evidentiary hearing. We affirm the judgment of the trial court.

I

FACTUAL HISTORY

The record reveals the following facts. The planned municipal parking garage is part of a larger cooperative

---

[4] Practice Book § 65-2 provides in relevant part: "After the filing of an appeal in the appellate court, but in no event after the case has been assigned for hearing, any party may move for transfer to the supreme court. . . ."

school project, known as the Learning Corridor.[5] The city is the owner of the Learning Corridor. On June 29, 1998, the project construction manager[6] issued a bid package for the construction of the parking garage. At that time, the bid specifications did not contain a project labor agreement requirement.

The bid package required bidders to attend a mandatory prebid conference on September 23, 1998. A general contractor who did not attend that conference was not permitted to submit a bid. Subcontractors, who could not bid on the project, were not required to attend the conference. No general contractor who then was a member of the association attended that mandatory conference. According to the plaintiffs, however, a contractor who had attended the mandatory conference and had bid on the project later joined the association.[7]

In October, 1998, the city authorized the use of a project labor agreement for the project. As a result, on October 14, 1998, the project construction manager issued a supplement to the bid package that required

[5] The Learning Corridor project includes the preparation and construction of a regional Montessori magnet school, a regional math, science and arts magnet high school and a city of Hartford middle school, along with the parking garage, all to be located in Hartford.

[6] The construction manager of the project, the Gilbane Building Company, is responsible for overseeing the project construction. The program manager of the Learning Corridor, a nonprofit corporation known as the Learning Corridor Corporation, contracted with the Gilbane Building Company to serve as construction manager.

The parties appear to dispute the city's level of responsibility in awarding the contract. The city states that it "is not responsible for awarding contracts for construction of the garage," 'and that other entities have direct control of the construction work. The plaintiffs argue that, as the owner of the project, the city is the party responsible for their alleged injury. We do not need to resolve this issue in order to determine the plaintiffs' standing to raise their claims.

[7] At the evidentiary hearing, the plaintiffs professed not to know when that contractor had joined the association. They did not, however, dispute the city's contention that that contractor had become a member only the day before the hearing.

any successful bidder on the project to become a party to and comply with the project labor agreement.

The project labor agreement is a prehire agreement that is signed by the construction manager, the local unions and the contractors of the project. The city approved the use of a project labor agreement after the project's construction manager and a construction consultant recommended the use of one in order to obtain the large number of skilled construction and craft employees necessary to complete the project in time for the opening day of the schools, and to minimize the risk of work disruptions and strikes. The stated purpose of the project labor agreement is to enhance "the timely completion of the Project without interruption or delay . . . through the establishment of a framework for labor-management cooperation and stability."

Under the terms of the project labor agreement, project contractors agree to abide by the collective bargaining agreements of the trade unions, including making contributions to employee benefit trust funds, and to recognize the trade unions as the sole collective bargaining representatives of employees working on the project. The unions agree not to engage in any strike, slowdown or other disruption of the work on a project. In addition, regardless of the expiration of any individual collective bargaining agreements, the parties to the project labor agreement agree that its provisions will remain in full force throughout the term of the project. There is, however, no requirement that all project workers be members of a union.

The two subcontractor plaintiffs alleged that they had planned to submit subcontract bids to general contractors who intended to bid on the construction project, but they decided not to do so because of the additional conditions imposed by the project labor

agreement requirement. The association alleged that, but for the project labor agreement requirement, some of its contractor members would have submitted bids on the project. The construction manager's representative testified that he had received five bids on the project, of which two had been submitted by nonunion contractors.

## II

## STANDING REQUIREMENTS

### A

The plaintiffs contest the validity of the trial court's determination that they failed to establish their standing to challenge the project labor agreement requirement. Although they dispute the validity of two evidentiary rulings of the trial court,[8] the plaintiffs do not otherwise claim that they lacked a full opportunity to make an evidentiary presentation with respect to their standing. Their principal claim is that the trial court should have concluded that the use of a project labor agreement illegally results in the absence of a level playing field for union and nonunion contractors and subcontractors interested in participating in a government building project. We disagree.

As a preliminary matter, we consider the standard of review that governs our examination of the plaintiffs' claims. The scope of our review depends upon the proper characterization of the rulings of the trial court. *Morton Buildings, Inc.* v. *Bannon*, 222 Conn. 49, 53, 607 A.2d 424 (1992). In the present appeal, the plaintiffs primarily challenge the propriety of trial court's legal conclusions. Our review of those conclusions is plenary. *Lawrence Brunoli, Inc.* v. *Branford*, 247 Conn. 407, 410, 722 A.2d 271 (1999). The plaintiffs also claim that the trial court improperly considered certain testimony.

[8] See part V of this opinion.

We review the trial court's evidentiary rulings for abuse of discretion. *State* v. *Matos*, 240 Conn. 743, 764, 694 A.2d 755 (1997).

B

The present litigation raises no new issues of principle with respect to the requirements of standing, either in general or in the particular context of competitive bidding. To establish standing to raise an issue for adjudication, a complainant must make a colorable claim of direct injury. *Maloney* v. *Pac*, 183 Conn. 313, 321, 439 A.2d 349 (1981). "Standing is . . . a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . These two objectives are ordinarily held to have been met when a complainant makes a colorable claim of direct injury [that the complainant] has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy . . . provides the requisite assurance of concrete adverseness and diligent advocacy." (Citations omitted; internal quotation marks omitted.) Id., 320–21.

As a matter of common law, an unsuccessful bidder on a state or municipal contract has no contractual right that would afford standing to challenge the award of a contract. " '[A] bid, even the lowest responsible one, submitted in response to an invitation for bids is only an offer which, until accepted by the municipality, does not give rise to a contract between the parties.' *John J. Brennan Construction Corporation, Inc.* v. *Shelton*, 187 Conn. 695, 702, 448 A.2d 180 (1982) . . . see also *Spiniello Construction Co.* v. *Manchester*, [189 Conn. 539, 456 A.2d 1199 (1983)]; *Joseph Rugo, Inc.* v. *Henson*, 148 Conn. 430, 171 A.2d 409 (1961); *Austin* v.

*Housing Authority*, [143 Conn. 338, 345, 122 A.2d 399 (1956)]; 10 McQuillin, Municipal Corporations (3d Ed. Rev.) § 29.80. An unsuccessful bidder, therefore, has no legal or equitable right in the contract. Not unlike any other person whose offer has been rejected, the disappointed bidder has no right to judicial intervention. See *Perkins* v. *Lukens Steel Co.*, [310 U.S. 113, 129, 60 S. Ct. 869, 84 L. Ed. 1108 (1940)]; *Austin* v. *Housing Authority*, supra, 349." (Citation omitted.) *Ardmare Construction Co.* v. *Freedman*, 191 Conn. 497, 501–502, 467 A.2d 674 (1983); see *Lawrence Brunoli, Inc.* v. *Branford*, supra, 247 Conn. 411.

Moreover, no statute grants unsuccessful bidders standing to challenge the award of a state contract. See *Ardmare Construction Co.* v. *Freedman*, supra, 191 Conn. 502–503. In particular, state and local competitive bidding laws have not been enacted in order to protect bidders. These laws serve to guard against abuses in the award of contracts such as favoritism, fraud or corruption and are enacted "solely for the benefit of the public and in no sense create any rights in those who submit bids." *John J. Brennan Construction Corp., Inc.* v. *Shelton*, supra, 187 Conn. 702.

Despite these substantial constraints, we have recognized a limited exception to the rules of standing in order to provide a means of protecting the public's interest in properly implemented competitive bidding processes. *Ardmare Construction Co.* v. *Freedman*, supra, 191 Conn. 504–505; *Spiniello Construction Co.* v. *Manchester*, supra, 189 Conn. 545. Under this exception, unsuccessful bidders have standing to challenge the award of a public contract "where fraud, corruption or acts undermining the objective and integrity of the bidding process existed . . . ." *Ardmare Construction Co.* v. *Freedman*, supra, 504–505. Like a comparable action based on federal law, such a suit is " 'brought

by one who suffers injury as a result of the illegal activity, but the suit itself is brought in the public interest by one acting essentially as a "private attorney general." ' " Id., 504, quoting *Scanwell Laboratories, Inc.* v. *Shaffer*, 424 F.2d 859, 864 (D.C. Cir. 1970).

In *Unisys Corp.* v. *Dept. of Labor*, 220 Conn. 689, 600 A.2d 1019 (1991), we expanded this exception to confer standing on a nonbidder under narrowly defined circumstances. We held that a plaintiff who had not submitted a proposal on a public project had standing to challenge a specification contained in the bid documents if that specification precluded the plaintiff's participation in a manner that impaired the fairness of the bidding process. Id., 694–95. The specification that was at issue in *Unisys Corp.* required proposals to incorporate the use of computer products from only one manufacturer, IBM. Id., 690–91. We afforded standing to the plaintiff, a manufacturer of allegedly functionally equivalent computer software and hardware products, to challenge the validity of that anticompetitive specification. Id., 694–95. Despite its status as a nonbidder, we held that the plaintiff would have standing if it could show that: (1) it would have submitted a proposal, but for the contested specifications; and (2) its product was functionally equivalent to that specified in the request for proposals. Id., 695.

Our policy to limit standing so as to deny some claims brought by unsuccessful and precluded bidders is designed to protect twin goals that serve the public interest in various, sometimes conflicting, ways. The standing rules aim "to strike the proper balance between fulfilling the purposes of the competitive bidding statutes and preventing frequent litigation that might result in extensive delay in the commencement and completion of government projects to the detriment of the public." *Ardmare Construction Co.* v. *Freedman,*

supra, 191 Conn. 505; *Unisys Corp.* v. *Dept. of Labor,* supra, 220 Conn. 694.

As the parties agree, the plaintiffs bear the burden of establishing that they have standing. *Fink* v. *Golenbock,* 238 Conn. 183, 199, 680 A.2d 1243 (1996). In accordance with these principles, to establish their standing to challenge the competitive bidding process in the present case, the plaintiffs had to establish a colorable claim that: (1) they either (a) had submitted a bid or (b) would have submitted a bid but for the alleged illegalities in the bidding process and the precluded bid was functionally equivalent to the project specifications; and (2) the alleged illegalities amounted to fraud, corruption, favoritism or acts undermining the objective and integrity of the competitive bidding process.

C

The plaintiffs argue that the trial court's analysis of standing was improper because it reached the merits of the plaintiffs' claims in evaluating whether the city's decision to use a project labor agreement was a proper exercise of its discretion. We disagree.

The plaintiffs observe, quoting *Assn. of Data Processing Service Organizations, Inc.* v. *Camp,* 397 U.S. 150, 153, 90 S. Ct. 827, 25 L. Ed. 2d 184 (1970), that standing "concerns . . . the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question" and does not involve an inquiry into the merits of the claim. According to the plaintiffs, whether adoption of the project labor agreement requirement was within the city's discretion was a question separate and apart from the question of their standing to challenge the city's action.

The general rule of standing cited by the plaintiffs is not contested. As the trial court noted, however, that

rule is not inconsistent with the particular standard applicable to disappointed and would-be bidders: "By requiring [the association] to produce evidence that the bidding process was undermined by fraud, corruption or favoritism, the court is simply forcing the party challenging the competitive bidding process to make a colorable claim of injury that it is within the zone of interests protected by the competitive bidding laws . . . ." Although the plaintiffs were not required to prove the merits of their claim, they did have the lesser burden of establishing a *colorable* claim. See *Maloney* v. *Pac*, supra, 183 Conn. 321. Under the test for standing set forth in *Unisys Corp.*, *Ardmare Construction Co.* and *Spiniello Construction Co.*, the trial court was required to conduct an evidentiary hearing to decide whether the plaintiffs had established a colorable claim that the project labor agreement requirement had undermined the integrity or objectives of the competitive bidding process. The trial court's determination that the decision to adhere to a project labor agreement was within the city's discretion and the bounds of the competitive bidding statutes, therefore, did not exceed the limits of our case law.

## III

### STANDING OF THE SUBCONTRACTORS

We turn now to the standing of the plaintiff subcontractors. The plaintiffs assert that the trial court improperly determined that the subcontractors did not have standing to challenge the bidding process. We are unpersuaded by their argument.

The trial court determined that the subcontractors did not have standing because they did not have a legal stake in the bidding process. The court reasoned that a diminished possibility of potential work as subcontractors was too attenuated an interest to give the subcontractors a legal stake in the bidding process. The

court relied on *Milward Corp.* v. *Hartford*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 702290 (December 6, 1991, *Schaller, J.*) (5 Conn. L. Rptr. 344), in which the court concluded that a subcontractor did not have standing to challenge a public bid award. The trial court reasoned that, because a subcontractor has no legally protected interest in having its bid accepted by a general contractor, it can have no legally protected interest in having its general contractor's bid accepted by a public entity. See *Bauman & Garrity of Lakeville, Inc.* v. *George E. Emerson, Inc.*, 14 Conn. App. 261, 265 n.3, 540 A.2d 710 (1988).

The plaintiffs argue that the reasoning of *Milward Corp.* does not apply because the subcontractors are not asserting contractual rights, but are challenging the impact of the bid specifications on the bidding process. Moreover, the plaintiffs argue, the subcontractors can be affected directly by the project labor agreement requirement, because, if a subcontractor's bid is accepted by the general contractor that has been awarded the project contract, that subcontractor also would be required to sign the project labor agreement.

The problem with the plaintiffs' arguments is that the limited standing we have granted to disappointed and excluded contractors to bring challenges based on competitive bidding laws is designed to protect the interests of the public, not those of the contractors. The plaintiffs do not dispute the fact that the subcontractors did not and could not have bid on the project. We can discern no reason for expanding the "private attorney general" standing granted to contractors that bid or were precluded from bidding on a public project. On the contrary, permitting legal challenges from the numerous subcontractors that potentially could be affected by a particular bidding process would be likely to upset the balance in protecting the public's dual interests in fair

public bidding processes and in the efficient completion of public works projects.

The plaintiffs also argue that the subcontractors should be granted standing because, for standing purposes, their claims resemble those made in cases in which subcontractors have been permitted to challenge public bidding processes for violating constitutional protections against discrimination on the basis of race. The difference between the cases, however, is substantial. In the cases upon which the plaintiffs rely, the allegations were that the subcontractors' *own* constitutional rights to equal protection had been violated by the contested bid provisions. In the present case, the plaintiffs do not assert standing on the basis of a claim that the subcontractors' own legal rights were violated, but allege, rather, that the competitive bidding statutes were undermined.[9] As previously noted, these statutes have been enacted to protect the public's interests and do not provide a basis for subcontractor standing. The standing granted in the equal protection cases cited by the plaintiffs, therefore, has no analogy to the standing subcontractors seek in the present case.[10] We conclude that the trial court properly concluded that the subcontractors did not have standing.

## IV

## STANDING OF THE ASSOCIATION

We next consider the plaintiffs' claim that the trial court improperly concluded that the association did not have standing to raise the claims of its members. Although associations may have standing as surrogates

[9] As we noted in footnote 3 of this opinion, the plaintiffs alleged constitutional violations in their complaint, but have not pursued them in the present appeal.

[10] The plaintiffs have been unable to cite to us any case, other than those involving a constitutional equal protection claim, in which subcontractors were granted standing to challenge a competitive bidding process.

for their members, we are not persuaded that the association in the present case has established that it had standing procedurally or substantively when the complaint was filed.

## A

In evaluating the standing of the association, the trial court applied the federal test for representational standing that was articulated in *Hunt* v. *Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977). We have adopted that test as a matter of Connecticut law. See *Connecticut Assn. of Not-for-Profit Providers for the Aging* v. *Dept. of Social Services*, 244 Conn. 378, 386, 709 A.2d 1116 (1998). Under that test, "[a]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." (Internal quotation marks omitted.) Id.

The trial court concluded that the association did not have standing because it did not meet the first part of that test: none of its members would otherwise have had standing to challenge the bid process. The plaintiffs argue to the contrary, both with respect to the subcontractor members of the association and with respect to the general contractor members of the association. We agree with the trial court.

We concluded in part III of this opinion that subcontractors do not have standing to challenge the project labor agreement requirement. Their membership in the association, accordingly, does not confer standing on the association.

The remaining question, therefore, is whether the general contractor members of the association would

have had standing to mount such a challenge. In order to have standing, a general contractor member would have had to establish a colorable claim that: (1) either it bid on the project, or it would have submitted an equivalent bid, but for the project labor agreement requirement; and (2) inclusion of the project labor agreement requirement effectuated fraud, corruption, favoritism or other acts undermining the objective and integrity of the bidding process. See *Unisys Corp.* v. *Dept. of Labor*, supra, 220 Conn. 694–95; *Ardmare Construction Co.* v. *Freedman*, supra, 191 Conn. 504–505.

In the present case, the plaintiffs did not establish that the general contractor members of the association had met either part of this test. With respect to the first part, the association did not show that any of its general contractor members had bid on the project or would have bid on the project. At the time of the filing of the complaint, the membership of the association included no project bidder.[11] Indeed, even before the project labor agreement specification had been added to the bid requirements, a mandatory prebid conference was held, but no member of the association attended. Thus, the record does not support a claim that these general contractors would have bid on the project but for the project labor agreement requirement, because none of them was qualified to do so at the time that the requirement was instituted. The association cannot, therefore, invoke the standing of its general contractor members as a basis for its own standing to pursue its challenge to the validity of the project labor agreement requirement.

Even if this foundational element had been met by testimony of the association's general contractor members that they would have bid, but for the project labor

---

[11] A contractor who had attended the mandatory conference and bid on the project joined the association one day before the evidentiary hearing. That contractor's testimony was excluded from the hearing, however. We uphold that ruling of the trial court in part V of this opinion.

agreement specification, the association still cannot prevail under the second part of the standing test. The crux of the association's claim is that its general contractor members were precluded from participation in the bid process because the project labor agreement requirement imposed costs upon nonunion general contractors that made it economically unfeasible for them to bid. As a result, the association argues, general contractors and the association have standing to challenge the project labor agreement as a specification that, as in *Unisys Corp.*, arbitrarily and anticompetitively limits access to the bidding process. The association contends that limiting the number of potential bidders violates not only the integrity of competitive bidding but also injures the general public by driving up the cost of government funded projects. Like the trial court, we conclude that the association has failed to make even a colorable factual showing to support this argument.

Even assuming that the project labor agreement requirement might increase the project's cost,[12] we know of no requirement in the competitive bidding statutes that propels cost considerations to the top of the list of appropriate considerations for public contract specifications. If cost alone were the determinative factor of appropriate bid criteria, disappointed bidders or

[12] We note that the plaintiffs have provided no explanation as to how the alleged increased expense to some potential bidders would raise the costs of the overall project. An increase in costs in one aspect of a project can equally well result in overall cost savings for the project. By avoiding labor disruption and maintaining a supply of skilled workers, as the project construction manager testified the project labor agreement was designed to do, the requirement could reduce overall costs. The record in this case does not, in fact, support the association's claim that cost considerations precluded nonunion general contractors from participating in the bidding process. Two of the five bidders were nonunion contractors. The association presented no testimony to support its claim that government projects using project labor agreements had higher total costs than other similar projects without such a requirement.

nonbidders would have virtually unlimited opportunities to litigate project specifications on the ground of alternate designs, materials, safety requirements and so on. Such litigation would involve courts in comparative cost assessments that would severely impair the discretion of governmental bodies entrusted with the responsibility for governmental construction projects. It is neither unusual nor unfair for project specifications to give some potential bidders an economic advantage over others because of factors such as the bidder's expertise, specialization and reliability.

The claim made by the association in this case is much more sweeping than the one that we recognized in *Unisys Corp.* v. *Dept. of Labor*, supra, 220 Conn. 690–91. The objection to the specification in *Unisys Corp.* was not that IBM equipment would be more expensive, but that vendors of functionally equivalent hardware or software had been excluded from the bidding process. Id., 691, 695. Our focus was not on the possibility that a particular specification might limit the number of eligible bidders, but on whether the specification necessarily had an adverse impact on the integrity of the bidding process. See id., 696.

As the trial court observed, the record in the present case demonstrates a nondiscriminatory decision by the city to use a project labor agreement, in the public interest, to avoid delays in the project and to recruit and maintain the necessary workforce. The court reasonably determined that the city's legitimate business decision fell within the bounds of the discretion afforded to the city by our competitive bidding statutes.

In conclusion, we reiterate our adherence to the boundaries of the standing principles established in our existing competitive bidding case law. Our decision in *Ardmare Construction Co.* v. *Freedman*, supra, 191 Conn. 497, is illustrative. In that case, the plaintiff, the

lowest bidder on a public contract, lost a contract award because the signature of its president had been rubber-stamped, not hand-signed, on the bidding form. Id., 499. We concluded that the plaintiff did not have standing to challenge the award process, despite the fact that the bidders were provided with no notice of the requirement. Id., 505–506. The determinative factor, we held, was not whether some bidders had been precluded from the bidding process but whether the requirements in that process had been applied consistently and in good faith. Id. That, essentially, is what has occurred in the present case as well.[13] In light of the evidentiary record in the present case, the association has failed to establish its standing to challenge the validity of a project labor agreement requirement in the city's project specifications.

B

The plaintiffs' final challenge to the trial court's ruling on standing is premised not on their own conduct but on that of the city. They allege that the court's finding of a proper exercise of discretion by the city in its decision to use a project labor agreement was flawed because the finding lacked an evidentiary foundation.

The premise of the plaintiffs' argument is that the testimony of a representative of the construction manager and the construction consultant was not pertinent to ascertaining the reasoning of the city's decision maker, the city council, in adopting the project labor agreement requirement. For two reasons, that argument is not persuasive.

First, as a matter of law, the plaintiffs bore the burden of establishing a colorable claim of fraud, favoritism or

[13] Although we have examined the relevant out-of-state authorities, we are not persuaded to follow cases in other jurisdictions that, according to the plaintiffs, have permitted contractors or their associations to challenge project labor agreement requirements. In our view, well established Connecticut law is determinative of the conclusion that the plaintiffs lack standing.

other acts undermining the objective and integrity of the bidding process. It was not the city's obligation to prove the opposite.

Second, as a matter of fact, the construction manager's representative testified that he had shared his reasons for supporting a project labor agreement with the construction consultant. The construction consultant, who was head of the Learning Corridor Corporation, testified, in turn, that his recommendations had been provided to the city manager and to the city council before the city made its decision. If necessary, these professional recommendations amply supported the city's exercise of its discretion.

V

EXCLUSION OF TESTIMONY

We turn now to the plaintiffs' claim that they are entitled to a new evidentiary hearing because the trial court improperly excluded the testimony of two of their proposed witnesses. We uphold the trial court's rulings.

It is hornbook law that the trial court has broad discretion in ruling on the admissibility and relevance of evidence. *State* v. *Matos*, supra, 240 Conn. 764. We will not overturn the trial court's evidentiary rulings in the absence of a showing that the trial court clearly abused its discretion and that the ruling likely affected the court's ultimate determination. *Swenson* v. *Sawoska*, 215 Conn. 148, 153, 575 A.2d 206 (1990).

One witness who, according to the plaintiffs, was improperly precluded from testifying on their behalf was a general contractor who had bid on the project and, subsequent to the filing of the complaint and the motion to dismiss, had become a member of the association. The plaintiffs state that this witness would have testified that he would not have signed the project labor agreement had his company been awarded the contract.

The plaintiffs sought to introduce that testimony to establish the standing of the association by showing that one general contractor member of the association had submitted a bid on the project.

The city objected to the testimony on the ground that the integrity of the judicial process requires issues to be tried in the manner in which the parties have framed them in their pleadings. See *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 570, 657 A.2d 212 (1995). According to the city, exclusion of the witness' testimony was necessary to prevent the plaintiffs from attempting to prove a fact that the city had shown to be untrue at the time the complaint was filed.

We agree with the city that the trial court did not abuse its discretion in excluding the testimony of a bidder who joined the association on the eve of the scheduled evidentiary hearing. The trial court has inherent authority to supervise and manage the orderly presentation of evidence. *Drabik* v. *East Lyme*, 234 Conn. 390, 400, 662 A.2d 118 (1995); *State* v. *Carter*, 228 Conn. 412, 426–27, 636 A.2d 821 (1994); see *Bauer* v. *Waste Management of Connecticut, Inc.*, 239 Conn. 515, 521, 686 A.2d 481 (1996) (whether to permit amendment of pleadings on eve of trial is matter entrusted to discretion of trial court). The plaintiffs do not dispute that, until the day before the evidentiary hearing, the association had no members who had bid on the project. The city's motion to dismiss for lack of standing properly focused on the facts alleged in the plaintiffs' pleadings. It was within the trial court's discretion to exclude evidence that came into existence after the pleadings had been filed and yet was proffered to prove a claim made in the pleadings.

Moreover, even if the trial court's ruling had been to the contrary, the plaintiffs could not have prevailed. Had the witness been permitted to testify, the association

would have met the first part of the test for contractor standing, in that it would have had a member who had bid on the project. The testimony would not, however, have affected the plaintiffs' failure to establish the second part of test for standing, that is, a colorable claim of fraud, favoritism or other acts undermining the objective and integrity of the bidding process. Accordingly, we decline to disturb the court's ruling.

The plaintiffs also attempted to call as a witness the project manager for the apparent winning bidder. They argue that the witness would have testified that the project labor agreement requirement would increase the price of subcontractor bids to the general contractor of the project, thus driving up contractor costs and resulting in higher bids on the project overall. The city contends that the testimony was properly excluded as irrelevant because it did not tend to establish that the project labor agreement requirement undermined the objective and integrity of the bidding process.

The plaintiffs' claim of evidentiary propriety with regard to this witness is as unpersuasive as their other claim of evidentiary error. The plaintiffs were able to introduce other testimony to show that the project labor agreement would increase costs for nonunion subcontractors, and the proffered evidence would have added little to this showing. More significantly, because showing that a project specification makes a project more expensive does not by itself establish a violation of the competitive bidding statutes, the evidence would not have demonstrated the plaintiffs' standing to challenge the use of a project labor agreement.

VI

CONCLUSION

We conclude that the trial court properly addressed the standing requirements that govern the competitive bidding process in this state. It held a proper evidentiary

hearing to afford the plaintiffs the opportunity to demonstrate their standing.

Courts are no better suited to micromanage competitive bidding than they are suited to micromanage other public enterprises. Courts have the responsibility to protect the public interest to ensure that the competitive bidding process conforms with principles of fairness and integrity so as to exclude fraud, corruption or favoritism. Any further judicial intervention would serve only the interests of delay. We conclude, therefore, that the trial court properly concluded that none of the plaintiffs had made a colorable showing of their standing to challenge to the validity of the city's use of a project labor agreement for the construction of the Learning Corridor parking garage.

The judgment is affirmed.

In this opinion CALLAHAN, C. J., and BORDEN, J., concurred.

BERDON, J., with whom MCDONALD, J., joins, dissenting. The court, in a hypertechnical ruling on standing, avoids a substantive issue that, in the public interest, we should review. The issue is whether the bidding requirements of the defendant, the city of Hartford, violate state and local competitive bidding statutes. The criterion in question requires that general contractors and subcontractors on a particular project be bound by a project labor agreement that provides that they must agree to follow the provisions of existing collective bargaining agreements, notwithstanding the fact that those contractors and subcontractors had not entered into those agreements and philosophically were opposed to such agreements.

The public interest should compel this court to address this issue, for it is one that affects millions of dollars of public expenditures. As one court has noted:

"[Project labor agreements] can contravene the goals of competitive bidding. By mandating that workers belong to certain limited labor organizations, [project labor agreements] restrict bidders to contractors with relationships with those labor organizations. The obvious effect of such a restriction is to lessen competition." *Tormee Construction, Inc.* v. *Mercer County Improvement Authority*, 143 N.J. 143, 148, 669 A.2d 1369 (1996). On the other hand, another court has found that project labor agreements can be consistent with competitive bidding statutes and will, therefore, be upheld if the government entity proves that "(1) a project is of such size, duration, timing, and complexity that the goals of the competitive bidding statute cannot otherwise be achieved and (2) the record demonstrates that the awarding authority undertook a careful, reasoned process to conclude that the adoption of a [project labor agreement] furthered the statutory goals." *John T. Callahan & Sons, Inc.* v. *Malden*, 430 Mass. 124, 133, 713 N.E.2d 955 (1999). At this stage in the proceeding, I do not express any opinion on how this court should rule on the merits of the plaintiffs' claim. I do, however, conclude that the public interest should compel us to open the courtroom doors in order to review these claims. The majority avoids these substantive claims by narrowly ruling that the plaintiffs have no standing. In doing so, it stands this court's decision in *Unisys Corp.* v. *Dept. of Labor*, 220 Conn. 689, 600 A.2d 1019 (1991), on its head.

I rely on the following undisputed facts recited in the plaintiffs' brief. "This action arises out of one phase of a planned construction project known as the Learning Corridor Project [project] to be constructed [in] Hartford. The city is the owner of the project. . . . The entire project will include construction of a regional Montessori Magnet School, a city of Hartford Middle School including [a] commons building, a regional Math,

Science and Arts Resource Magnet High School and the parking garage. . . . The advertisement and notice to bidders for the parking garage phase was issued on June 29, 1998. On the same date the city's construction manager, Gilbane Construction Company [Gilbane], issued its general instructions to bidders. . . . These general instructions contained no mention of a [project labor agreement] for the project. In fact, in the summer of 1998, following the issuance of the bid package for the parking garage phase of the project, a principal of the plaintiff [Electrical Contractors, Inc. (Electrical Contractors)], Leo Christmas, received assurances that a project labor agreement would not be used on the project. The person making those assurances was Eddie Perez, chairman of the [Learning Corridor Corporation (Learning Corporation)]. . . . The Learning Corporation is the project manager for the city. . . .

"The very first notice to potential bidders that the project would be subject to a [project labor agreement] came in an addendum to the bid package [supplement no. 2], which was issued October 14, 1998, only nine days before the scheduled bid opening date of October 23, 1998. . . . Supplement no. 2 revised the description of the bid documents to include the [project labor agreement].

"The [project labor agreement] describes itself as an agreement between Gilbane, as construction manager, and the Greater Hartford-New Britain Building and Construction Trades Council and its affiliated Local Unions . . . [signatory unions]. . . . The city also signed the [project labor agreement]. The [project labor agreement] recognizes the signatory unions as the 'sole and exclusive bargaining representative' of all craft employees working on the project. . . . It specifically requires all trade contractors and subcontractors working on the project to adhere to the local collective bargaining agreements between the union's signatory

hereto and their respective employer associations. . . . The parties agree that there will be no strikes or lock-outs. . . . All contractors and subcontractors are required to pay the wages according to the employee classifications and wage rates specified in the collective bargaining agreements. . . . They also must pay contributions to employee benefit trust funds 'designated in the appropriate schedule A.' . . . Despite numerous other references throughout the [project labor agreement] to the collective bargaining agreements and 'schedule As,' these documents are not otherwise described in the [project labor agreement], nor were they attached to the [project labor agreement] which was issued as part of supplement no. 2 to the bid package. . . . The [project labor agreement] also contains a 'union security provision' which provides in its entirety: 'Membership in good standing for the purpose of this agreement shall be defined as financial core membership through the payment of dues and fees uniformly applied.' . . .

"Both [Electrical Contractors] and the plaintiff [Rhoan Stewart, doing business as Dynamic Electrical Contractor (Dynamic)] planned to submit bids for the electrical work to general contractors, who would then submit bids to the city. . . . Dynamic was in the process of putting together a bid when the [project labor agreement] was announced. At least three general contractors had contacted [Dynamic] to solicit [its] participation. . . . However, after reviewing the [project labor agreement] and attempting to learn as much as [it] could about its requirement Dynamic decided that [it] could not submit a bid because of the [project labor agreement]. . . . [Electrical Contractors] also began to develop estimates for the electrical work and received a number of requests from general contractors to submit bids to them. [Electrical Contractors] spent an estimated $15,000 in developing its bidding information.

. . . When the [project labor agreement] was announced, [Electrical Contractors] spent additional time and resources investigating the requirements it would impose and ultimately determined not to submit a bid because of the [project labor agreement]. Among other things, [Electrical Contractors] determined [that] the terms of the applicable collective bargaining agreement and the associated work rules would increase its costs and raise the amount of its bid. . . . It also determined that it would have to make benefit payments to the union rather than directly to the benefit programs it had established for its employees."

The majority's decision denying the plaintiffs standing flies in the face of the more liberal approach to standing that we adopted in *Unisys Corp.* v. *Dept. of Labor*, supra, 220 Conn. 689. In that case, we declared: "Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . These two objectives are ordinarily held to have been met when a complainant makes a colorable claim of direct injury he has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy . . . provides the requisite assurance of concrete adverseness and diligent advocacy." (Citation omitted; internal quotation marks omitted.) Id., 693.

The undisputed facts previously set forth not only demonstrate a colorable claim, but actual harm to the plaintiff subcontractors, Dynamic and Electrical Contractors. More specifically: (1) Dynamic would have submitted a bid if not for the project labor agreement; and (2) Electrical Contractors expended an estimated

$15,000 in developing its bidding information, all of which was rendered useless when the bidding requirements were amended belatedly to include a project labor agreement requirement.

The majority, however, will not extend standing to those subcontractors because "the limited standing we have granted to disappointed and excluded contractors to bring challenges based on competitive bidding laws is designed to protect the interests of the public, not those of the contractors." This simply ignores the fact that contractors depend upon subcontractors. When the field of the number and scope of subcontractors is limited as a result of a bid requirement, there is an adverse effect on the competitive bids submitted by contractors and the interests of the general public are clearly implicated. That is simple economics.

The named plaintiff, Connecticut Associated Builders and Contractors (association), which is the state chapter of a larger association, also should have standing. Connecticut follows the federal test for representational standing, which provides that "[a]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." (Internal quotation marks omitted.) *Connecticut Assn. of Not-for-Profit Providers for the Aging* v. *Dept. of Social Services*, 244 Conn. 378, 386, 709 A.2d 1116 (1998).

The majority claims that the first requirement has not been met. This conclusion, however, ignores the fact that, Rashid Hamid of Naek Construction Company (Naek), a member of the association at the time of the

hearing on the motion to dismiss, attended the mandatory prebid conference. It is undisputed that Naek would have submitted a bid if not for the project labor agreement.[1] Consequently, the association meets the first prong of the test. We followed the same logic in *Gay & Lesbian Law Students Assn.* v. *Board of Trustees*, 236 Conn. 453, 673 A.2d 484 (1996), where the substantive issue to be decided was whether the United States military should be prohibited from using the facilities at the University of Connecticut School of Law because it discriminated against gay men and lesbians. The defendants in *Gay & Lesbian Law Students Assn.* argued "that, because the plaintiff has not demonstrated that one of its members was denied an interview with the military, there can be no aggrievement . . . ." Id., 469. Our answer was simply that "[t]he relevant question is not whether one of the plaintiff's members wants

[1] The majority argues that the trial court was justified in excluding Hamid's testimony because Naek was not a member of the association at the time the complaint was filed. The date of the membership is totally irrelevant, because Naek was a member at the time that the motion to dismiss was heard. Furthermore, the majority's justifications for the exclusion of this evidence relies on cases that are not pertinent. For example, it cites to *Bauer* v. *Waste Management of Connecticut, Inc.*, 239 Conn. 515, 521, 686 A.2d 481 (1996), which held that it was discretionary for the trial court not to allow an amendment to the pleadings on remand to that court. It likewise points to the authority of the trial court to "supervise and manage the orderly presentation of evidence . . . ." *Drabik* v. *East Lyme*, 234 Conn. 390, 400, 662 A.2d 118 (1995). *Drabik*, however, does not support the refusal to admit relevant evidence; it concerned the trial court's exercise of discretion in refusing to take judicial notice of the contents of the file of a previous action involving the same parties. Id. And the majority's reliance on *State* v. *Carter*, 228 Conn. 412, 426, 636 A.2d 821 (1994) (discretion of trial court to allow party to open case after it rested) is misplaced. Furthermore, we previously have held that "[w]hen issues of fact are necessary to the determination of a court's jurisdiction, due process requires that a trial-like hearing be held, in which an opportunity is provided to present evidence and to cross-examine adverse witnesses. The trial court erred in not holding such a hearing." (Internal quotation marks omitted.) *Unisys Corp.* v. *Dept. of Labor*, supra, 220 Conn. 695–96. The exclusion of relevant testimony to establish an essential fact is the equivalent of not having a hearing; the hearing becomes a sham.

to join the military; rather, the relevant question is whether the members are receiving the same placement opportunities as heterosexual students." Id., 469–70.

The majority's conclusion also overlooks the fact that the plaintiffs have alleged that contractors who are members of the association are also being denied the opportunity to bid because of the project labor agreement. See *Pamela B.* v. *Ment*, 244 Conn. 296, 308, 709 A.2d 1089 (1998) (on appellate review of motion to dismiss, facts alleged are taken as true and construed in light most favorable to pleader). According to the complaint in the present case, contractor members would have submitted bids if not for the project labor agreement. The United States Court of Appeals for the Ninth Circuit, in *Associated General Contractors* v. *Metropolitan Water District*, 159 F.3d 1178, 1181 (9th Cir. 1998), similarly concluded that a trade association with subcontractor members and contractor members who would have bid on projects if not for the project labor agreement, met the first prong of this same test. In doing so, the court noted that the association's members "have been and will be directly affected by [project labor agreements]" because they are being deterred from bidding on projects based on project labor agreements. Id.

The association also meets the second prong of the test because removing the project labor agreement would allow members to bid on projects while adhering to their philosophy of using nonunion labor. In applying the second prong of the test, the court in *Associated General Contractors* concluded: "There can be no doubt that [the plaintiff] meets the second [prong] . . . . Certainly its desire to remove restrictions which, as it sees it, will interfere with favorable bidding conditions sought by its members is germane, even central, to its purposes." Id. Once again, the same reasoning applies to the present case.

Finally, it is undisputed that the third prong for representational standing has been met. No included member of the association is a necessary party in order for the court to decide the issue. See id. (summarily concluding that association of subcontractors and contractors met third criterion of federal test for representational standing and affording association standing to bring claim).

In sum, the public interest requires that we follow the lead of jurisdictions such as Massachusetts and New Jersey, and entertain the plaintiffs' claim. In *Modern Continental Construction Co.* v. *Lowell*, 391 Mass. 829, 835–36, 465 N.E.2d 1173 (1984), the Massachusetts Supreme Judicial Court held: "It is well established that parties challenging compliance with the bidding procedures set forth in [the competitive bidder statutes] need not meet rigid 'but for' standing requirements by asserting that if there had been compliance with the statute, they certainly would have been awarded the contract. The challenging party need show only that it possessed the potential to obtain the award. . . . If the situation were otherwise, the important role played by individual bidders in securing compliance with the bidding statutes and legislative policy objectives would be diminished." (Citation omitted.) See *John T. Callahan & Sons, Inc.* v. *Malden*, supra, 430 Mass. 129.

By declining to afford the plaintiffs standing, the majority of this court simply ducks the issue of whether project labor agreement requirements for a public construction contract violate state and local competitive bidding statutes. I would reverse the trial court judgment and find that all of the plaintiffs have standing. This matter should be remanded to the trial court for a determination of whether the project labor agreement is prohibited under the state and local statutory competitive bidding requirements for a public project.

Accordingly, I dissent.

MCDONALD, J., dissenting. I join in Justice Berdon's dissent.

I expressed my view that the plaintiffs have standing to assert that their first amendment rights have been violated in *Connecticut Associated Builders & Contractors* v. *Anson*, 251 Conn. 202, 740 A.2d 804 (1999) (*McDonald, J.,* dissenting), and, accordingly, I dissent in this case as well.