******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## CIVIC MIND, LLC *v.* CITY OF HARTFORD ET AL.
### (AC 46508)

Moll, Westbrook and DiPentima, Js.

*Syllabus*

The plaintiff appealed from the trial court's judgment dismissing its action against nineteen defendants concerning the defendant city's allegedly fraudulent solicitation of bids for the redevelopment of a stadium. The plaintiff claimed, inter alia, that the court improperly determined that it lacked standing to pursue its claims. *Held*:

The trial court properly dismissed the plaintiff's claims seeking injunctive and declaratory relief for lack of standing because the court correctly determined that the request for proposals issued by the defendant city in connection with the redevelopment project was not governed by the competitive bidding requirements of the applicable statute (§ 4b-91) or the applicable provision of the Hartford Municipal Code (§ 2-548).

The trial court properly dismissed the plaintiff's claims seeking monetary damages against the defendants other than the city because the root issue of those claims was that the plaintiff had participated in the request for proposals and was not awarded a contract, and the rejection of its proposal did not establish standing for the plaintiff to seek judicial intervention.

Argued May 28—officially released December 17, 2024

*Procedural History*

Action to recover damages for, inter alia, fraud, and for other relief, brought to the Superior Court in the judicial district of Hartford and transferred to the Complex Litigation Docket, where the court, *Farley, J.*, granted the defendants' motions to dismiss and rendered judgment thereon, from which the plaintiff appealed to this court. *Affirmed.*

*Patrick Tomasiewicz*, with whom, on the brief, was *Gregory A. Jones*, for the appellant (plaintiff).

*David R. Roth*, for the appellees (defendant city of Hartford et al.).

*Cathleen A. Giannetta*, with whom, on the brief, were *Molly M. Wilcox* and *Michelle Arbitrio*, for the appellees

(defendant Capital Region Development Authority et al.).

*Richard F. Wareing*, with whom, on the brief, was *Anthony J. Natale*, for the appellees (defendant Hartford Sports Group, LLC, et al.).

*Donna L. Cook*, with whom, on the brief, was *Alessandro J. Angelori*, for the appellee (defendant Michael Freimuth).

*Opinion*

MOLL, J. In this action concerning the redevelopment of Dillon Stadium (stadium)[1] in Hartford, the plaintiff, Civic Mind, LLC, appeals from the judgment of the trial court dismissing its complaint against the nineteen defendants, including the city of Hartford (city) and the Capital Region Development Authority (CRDA).[2] On appeal, the plaintiff claims that the court improperly granted motions to dismiss filed by the defendants on the ground that the plaintiff lacked standing to pursue its claims against the defendants. We disagree and, accordingly, affirm the judgment of the trial court.

The following facts, as alleged in the plaintiff's complaint or as established by uncontested evidence submitted in connection with the defendants' motions to dismiss, and procedural history are relevant to our resolution of this appeal. In 2012, the city began efforts to revitalize the stadium, which was built in 1935 and had fallen into a state of disrepair. In 2013, after soliciting bids, the city selected the plaintiff as its " 'preferred

---

[1] The record reflects that Dillon Stadium is currently named Trinity Health Stadium; however, the parties primarily refer to the stadium by its former name.

[2] The defendants are the city, CRDA, Luke Bronin, Sean Fitzpatrick, Glendowlyn Thames, Julio Concepcion, Andy Bessette, Suzanne Hopgood, Anthony Lazzaro, Kimberly Hart, David Jorgensen, Michael Matteo, Marcia Leclerc, Hartford Sports Group, LLC, Bruce Mandell, Joseph Calafiore, Scott Schooley, Data-Mail, Inc., and Michael Freimuth.

vendor' . . . ." In December, 2013, the plaintiff created a plan to develop and to manage the stadium, which included bringing United Soccer League (USL) and W-League soccer franchises to the city. In February, 2014, the city terminated the plaintiff from the stadium project because, as the plaintiff alleged, the plaintiff's founder and principal, Thomas Clynch, "refused to accept bribes" and to "cooperate" with a "criminal scheme" orchestrated by the city. In May, 2014, the city chose Premier Sports Management Group (PSMG) "to continue the work of [the plaintiff]"; however, PSMG's principals later were convicted of money laundering and fraud for illegal activities in connection with the stadium project.

In November, 2014, Clynch retained Hinckley, Allen & Snyder, LLP (Hinckley Allen), as legal counsel, and, shortly thereafter, the plaintiff filed an action against, inter alia, the city and PSMG (2014 action). See *Civic Mind, LLC* v. *Hartford,* Superior Court, judicial district of Hartford, Complex Litigation Docket, Docket No. CV-14-6055838-S. Shortly after the commencement of the 2014 action, Luke Bronin became a partner at Hinckley Allen and announced his candidacy for the mayorship of the city. In July, 2015, Bronin invited Clynch to his home to discuss (1) the 2014 action, (2) an ongoing investigation by the Federal Bureau of Investigation into the city's alleged solicitation and fraud, (3) the city officials who were involved in the scheme, and (4) Clynch's plans for the stadium, including securing professional soccer franchises. Thereafter, concerned with the firm's potential conflicts of interest, Clynch terminated Hinckley Allen as legal counsel. In January, 2016, Bronin began his tenure as the city's mayor.[3]

---

[3] The 2014 action was resolved in late 2017, after (1) the trial court, *Moukawsher, J.,* rendered summary judgment in favor of the city and (2) the plaintiff withdrew the remainder of its claims. See *Civic Mind, LLC* v. *Hartford,* Superior Court, judicial district of Hartford, Complex Litigation Docket, Docket No. CV-14-6055838-S (November 8, 2017) (65 Conn. L. Rptr. 470, 471).

On February 7, 2017, a shared plan was unanimously adopted by the city, CRDA, Hartford Sports Group, LLC (HSG), and Bruce Mandell, one of HSG's owners, "to publicly finance [the stadium] to HSG's specifications." This shared plan was developed using the plaintiff's "work [product], know-how, and professional soccer plans . . . ." In March, 2017, ICON Venue Group, a stadium design firm retained by HSG, performed a site visit at the stadium in partnership with the city and CRDA. On April 14, 2017, ICON Venue Group produced a report containing a comprehensive analysis to develop the stadium in accordance with USL specifications with a budget of $10.7 million (ICON report). The ICON report included internal city documents, vendor quotes, and a photo of individuals at the stadium, including Mandell and city representatives.

On August 9, 2017, Michael Freimuth, CRDA's executive director, offered the Bronin administration CRDA's help "to develop a plan to repair/upgrade and [reuse the stadium]." On August 22, 2017, Bronin accepted CRDA's offer.

On September 15, 2017, on behalf of the city, CRDA issued a request for proposals (RFP), the stated purpose of which was to "[seek] proposals from individuals, firms and/or organizations authorized to do business in the [s]tate of Connecticut who are interested in using, redeveloping and operating [the stadium] and potentially securing a professional sports team for that facility." The ICON report was not made available to the public in connection with the RFP.

The RFP expressly delineated five project goals: (1) "[s]ecur[ing] greater uses of [the stadium] with a strong preference for a professional sports team"; (2) "[p]rovid[ing] for the upgrade and repair of the [s]tadium," accompanied by a nonexhaustive list of renovations required to the existing facilities; (3) "[e]stablish[ing]

an operational management program for the [s]tadium"; (4) "[c]ompliment[ing] and assist[ing] Colt Park renewal and recreational programs operating within [Colt] Park"; and (5) "[s]pur[ring] other community redevelopment and renewal within the [United States] National Park area." (Emphasis omitted.) The RFP also established five selection criteria: (1) "[p]roposed use of [the stadium]"; (2) "[r]espondent's experience, technical competence and financial plan"; (3) "[r]espondent's capacity to perform work"; (4) "[p]rivate capital/public capital program"; and (5) "[e]fficacy of revenue return and economic impact to the [c]ity . . . ."

In addition, the RFP set forth several submission requirements, which instructed respondents to provide, inter alia, (1) a description of proposed use(s) for the stadium, along with any attendant business and marketing plans, (2) a budget and a description of necessary capital improvements, along with the sources of funding for such improvements, and (3) a plan to manage and to operate the stadium, along with proposed operating proforma reflecting annual revenues and expenses. The RFP also set forth various general conditions, including: "7. Issuance of [the] RFP does not obligate CRDA or the [c]ity . . . to undertake any action. [The] RFP does not commit CRDA or the [c]ity . . . to award a contract. CRDA reserves the right to use submissions as a basis for negotiation with one or more respondents and/or with parties other than those responding to [the] RFP and/or terms other than those set forth herein. CRDA reserves the right to waive compliance with and/or change any terms of [the] RFP."

On September 14, 2017, Kimberly Hart, a CRDA board member and CRDA's venue director, emailed Clynch to notify him of the forthcoming RFP. By the October 13, 2017 deadline specified in the RFP, CRDA received RFP submissions from the plaintiff, HSG, and a third respondent. HSG's submission proposed an investment

of approximately $10 million in public funds to reconstruct the stadium, with CRDA tasked with the development thereof and the city tasked with the management thereof, and a stated goal of securing a USL franchise. The plaintiff's submission proposed an investment of $1.5 million in private funding to upgrade the stadium and partnerships with (1) a Boston based stadium design firm, (2) the Connecticut Interscholastic Athletic Conference and Connecticut Association of Schools in order "to establish 'an annual calendar of competitive and inspiring high school sporting events,'" and (3) "Oakwood Soccer, a local, established, premier soccer club." On November 1, 2017, CRDA held a public forum in connection with the RFP, which included presentations from the respondents regarding their proposals.

On December 1, 2017, Freimuth mailed Bronin a letter accompanied by a memorandum outlining CRDA's recommendations regarding the stadium. Following its review of the three RFP submissions, and notwithstanding certain concerns, "particularly the scope of capital improvements and [the] level of public funding required," CRDA recommended that the city pursue an agreement with HSG to redevelop the stadium, as it "believe[d] the proposal offered by [HSG] represent[ed] the strongest plan moving forward." In contrast, CRDA determined that the plaintiff's RFP submission was, "in essence, a planning proposal that would utilize the expertise of a nationally known sports facility planner, but it [was] otherwise [nonresponsive] to the RFP . . . ." On December 14, 2017, the city accepted CRDA's recommendation, whereupon the city, CRDA, and HSG entered into negotiations.

In February, 2018, while negotiations among the city, CRDA, and HSG were ongoing, CRDA secured $10 million in funding for the stadium project from the State Bond Commission (commission), which funding was contingent on a signed agreement with a professional

soccer team. Around that time, HSG was awarded a USL franchise, which was named the Hartford Athletic and was operated by Hartford Athletic, LLC, an entity owned by HSG. The city, CRDA, and HSG proceeded to draft a term sheet, pursuant to which "the [city] would enter into a [l]icense [a]greement with [CRDA] to oversee stadium operations. CRDA [would], in turn, enter into a [s]tadium [u]se [a]greement with [HSG] to operate a USL team at the stadium pursuant to terms agreed to between the [c]ity and HSG as described [in the term sheet]." On March 26, 2018, Bronin presented the city's Court of Common Council (council)[4] with a resolution to authorize the city to enter into a license agreement with CRDA in accordance with the term sheet, as well as "other necessary agreements for the operation and use of [the stadium] in accordance with the [t]erm [s]heet," which resolution the council approved on April 9, 2018.

On June 8, 2018, the city and CRDA executed a license agreement (2018 license agreement). Pursuant to the 2018 license agreement, the city granted CRDA and its agents "a license and right of access to the [stadium] for the purpose of constructing and operating the New Dillon Stadium[5] and activities related thereto." (Footnote added.) The 2018 license agreement further provided, inter alia, that CRDA's agents "shall have the right and license to use New Dillon Stadium for the presentation of professional soccer and lacrosse as well as various community events and uses as provided in [a] [s]tadium [u]se [a]greement to be entered into by and among the [city, CRDA, and Hartford Athletic, LLC]

---

[4] Pursuant to the city's charter, "[t]he legislative power and authority of the City shall be vested in the Council. . . ." Hartford Charter, c. IV, § 1.

[5] The 2018 license agreement, in defining " 'New Dillon Stadium,' " provided that "[the stadium] is a former football stadium, and [the city] desires to construct substantial upgrades and convert [the stadium] into a soccer stadium that will host, among other things, professional soccer games, entertainment and community events . . . ."

. . . . [CRDA] shall construct the New Dillon Stadium in accordance with the final plans and specifications ensuring the [New Dillon] Stadium and field are built to [USL] and 'FIFA 2 Star' standards . . . ."

In July, 2018, notwithstanding the lack of an agreement with a professional soccer team in place, CRDA began spending some of the $10 million in funds awarded to it by the commission on the reconstruction of the stadium, with CRDA expending $4,039,356 between July, 2018, and February 24, 2019. During this period, HSG and its owners, Mandell, Joseph Calafiore, and Scott Schooley, contributed approximately $2.3 million toward the redevelopment of the stadium.[6]

On November 7, 2018, Mandell filed a self-reported complaint with the State Elections Enforcement Commission (SEEC) to report political contributions made by himself and by members of his family in the late summer and early fall of 2018. The complaint represented that Mandell, along with Calafiore and Schooley, had entered into an agreement with the city "to bring a professional soccer team to play at a municipal stadium" and that the city, CRDA, and HSG had entered into a stadium use agreement.[7]

On February 13, 2019, Bronin presented the council with a resolution to authorize the city to amend (1) the 2018 license agreement between the city and CRDA, and (2) "terms in a [s]tadium [u]se [a]greement . . . for the operation and use of [the stadium] by . . . Hartford Athletic, LLC . . . ." Bronin represented to the council that, "[i]n April 2018, [the council] authorized the [c]ity to enter into [the 2018] [l]icense [a]greement with CRDA

---

[6] Additionally, at some point, the Hartford Foundation for Public Giving, a nonparty to the present action, contributed approximately $1.5 million toward the redevelopment efforts.

[7] In accordance with a voluntary settlement agreement adopted in 2019, Mandell was required to pay a civil penalty of $45,000 to the SEEC for making improper political contributions.

to oversee the [s]tadium's renovations and approved terms which would form the basis of a tri-party [stadium] [u]se [a]greement . . . between the [c]ity, CRDA and [HSG, referred to therein as Hartford Athletic, LLC] for the operation and use of the [s]tadium. [The term sheet], which outlined the roles and responsibilities of the parties under the respective agreements was provided to [the council] at that time." Bronin further represented to the council that the city "wishe[d] to modify the form of agreements going forward with respect to [the stadium] to clarify the [c]ity's relationship between the parties as separate and distinct from each other. . . . [The city's] intent has always been that CRDA will lead the reconstruction efforts at [the stadium] and provide management services to the [c]ity, and that the utilization of the facilities at [the stadium] would constitute an agreement between the [c]ity and [Hartford Athletic, LLC]. To that end, the [c]ity proposes to clarify CRDA's [s]tadium operations management functions in an agreement separate and apart from the [stadium] [u]se [a]greement. In the [m]anagement [a]greement, CRDA would continue its oversight of the [s]tadium renovations and retain the [s]tadium operations management and fiduciary role that was outlined in the . . . [t]erm [s]heet. In turn, the [s]tadium [u]se [a]greement would be clarified to recognize that this understanding is and should be between [Hartford Athletic, LLC] and the [city], as the [o]wner of the [s]tadium." On February 13, 2019, the council approved this resolution.

On February 25, 2019, the city and Hartford Athletic, LLC, executed a stadium use agreement (2019 stadium use agreement), which "set forth the detailed terms and conditions pursuant to which (i) [Hartford Athletic, LLC] will use the [s]tadium in accordance with the terms [thereof] and will play Club Home Games (as defined [therein]) at the [s]tadium, (ii) [Hartford Athletic, LLC]

and the [Hartford Athletic] may host other Club Additional Events (as defined [therein]) at the [s]tadium, and (iii) the [city], and to the extent provided under [a separate agreement between the city and CRDA], [CRDA] will provide the [s]tadium and Stadium Premises [as defined therein] and its appurtenances for such games and other events in accordance with the terms and conditions set forth [therein]." The same day, the city and CRDA executed a stadium renovation and operation agreement (2019 stadium renovation and operation agreement), which "set forth the detailed terms and conditions pursuant to which [CRDA] shall renovate and operate the [s]tadium . . . ."[8]

According to CRDA and the city, the redevelopment of the stadium was completed in July, 2019.[9] The Hartford Athletic began playing its home games at the stadium on July 13, 2019.

On August 9, 2019, the State Contracting Standards Board (board) "form[ed] a working group to examine the procurement processes for the renovation of [the stadium]," which action was prompted by (1) a report by the State Auditors of Public Accounts, issued in 2019 (2019 SAPA report), regarding the expenditure of public funds on the stadium project, which report found that CRDA improperly had spent approximately $4 million of the funds awarded to it by the commission without satisfying the attendant requirement that an executed agreement with a professional soccer team be in place, (2) two contests filed with the board by Clynch on behalf of the plaintiff in 2018 regarding the RFP and

---

[8] The 2019 stadium renovation and operation agreement later was amended on February 1, 2022, "[t]o reflect the completion of the Renovations [as defined therein] and certain changes to CRDA's role with regard to the operation of the [s]tadium."

[9] In a personal affidavit filed in support of the HSG defendants' motion to dismiss, Mandell averred that the renovation of the stadium was completed in 2018.

the "award" to HSG, and (3) a discussion during a meeting of the board on December 14, 2018, regarding certain newspaper reports and the SEEC's investigation into Mandell's improper political contributions in 2018.

In 2020, the board issued its final report on the stadium (2020 final report). The board labeled the RFP and the "convoluted procurement process" as a "charade," questioning why the city pursued the RFP and the procurement process rather than, from the outset, licensing the use of the stadium to HSG and authorizing CRDA to renovate and to redevelop the stadium and its surrounding area, which, as the board found, "[i]n the end . . . is what actually occurred . . . ." The board found that on April 2, 2018, CRDA issued a construction management RFP to develop the stadium, with a nonparty named "Newfield Construction" being awarded the contract on June 1, 2018. The board also concluded that the RFP was deficient in a number of ways, including that it failed to disclose the estimated costs to all of the respondents, and provided recommendations to CRDA to ensure that future procurements provided all bidders or proposers with a "level playing field." In addition, the board concluded that, "[f]ollowing the RFP and recommendation of HSG by CRDA to the [c]ity, the [c]ity effectively abandoned the RFP by substantially changing the construct of the . . . RFP" without providing notification that it had abandoned the RFP process.

On January 31, 2022, the plaintiff commenced the present action. The first three counts of the plaintiff's fifty-six count complaint were directed to the city. In count one, the plaintiff asserted that the city violated the competitive bidding requirements of General Statutes § 4b-91[10] et seq. and/or § 2-546 et seq. of the Hartford

---

[10] Section 4b-91 was amended after September 15, 2017, when the RFP was issued, by No. 21-104, §§ 4 and 5, of the 2021 Public Acts, No. 21-198, § 3, of the 2021 Public Acts, No. 22-39, § 5, of the 2022 Public Acts, and No. 23-204, §§ 435 and 436, of the 2023 Public Acts. One of these public acts

Municipal Code (code). The plaintiff alleged that, notwithstanding the city's representations "to the public and all bidders that it would follow the RFP process under the Connecticut General Statutes and/or the [code] and proceed in a fair and equitable manner," the city conspired with "other persons to award the contract to remodel [the stadium] to an underqualified and improper bidder that was not in the city's best interests." More specifically, the plaintiff alleged that the city conspired with (1) Mandell and his partners to have them submit a bid to remodel the stadium using information that was unavailable to other bidders, thereby demonstrating favoritism, and (2) CRDA and its board members to encourage the plaintiff to participate in the RFP process despite having no intention to consider the plaintiff's bid, which, by law, should have been selected as the winning bid. The plaintiff further alleged that the city's "misrepresentations were intended to encourage other parties to submit bids for the purpose of validating its sham RFP process."

Count two of the complaint sounded in breach of contract. The plaintiff alleged that (1) the city invited the plaintiff to submit a bid in reliance on the city's representations that "it would follow the RFP process under the Connecticut General Statutes and/or the [code] and proceed in a fair and equitable manner," (2) the plaintiff submitted a bid in reliance upon the city's representations, thereby entering into a contract with the city pursuant to which (a) the plaintiff and the city would "follow the bidding requirements" and (b) the city "would proceed in a fair and equitable manner in effectuating the bidding statutes and/or ordinances,"

---

amended the portions of the statute cited here—subdivisions (2) and (4) of § 4b-91 (a)—as No. 23-204, § 435, of the 2023 Public Acts increased the estimated cost of the contracts governed by the provisions from $500,000 to $1 million; however, none of these amendments affects our analysis. Accordingly, in the interest of simplicity, we refer to the current revision of the statute.

and (3) the city breached this contract by engaging in fraud and showing favoritism toward HSG and its owners. In the alternative, in count three, the plaintiff asserted a claim of promissory estoppel, alleging that it relied on the city's misrepresentations that the city "would follow the RFP process under the Connecticut General Statutes and/or the [code] and proceed in a fair and equitable manner" in submitting its bid.

In count four of the complaint, the plaintiff asserted a claim of fraud against CRDA. The plaintiff alleged that, notwithstanding CRDA's representation "to the public and all bidders that it would follow the RFP process under the Connecticut General Statutes and proceed in a fair and equitable manner," CRDA conspired with the city, HSG, and others to award the contract to remodel and to develop the stadium to HSG and its owners notwithstanding the merits of the plaintiff's bid, which, by law, should have been the successful bid, thereby demonstrating fraud and favoritism. Additionally, the plaintiff alleged that "CRDA's misrepresentations were intended to encourage other parties to submit bids for the purpose of validating its sham RFP process."

The remaining fifty-two counts of the plaintiff's complaint asserted claims of (1) conspiracy to commit fraud, (2) tortious interference with a business expectancy, (3) conspiracy to commit tortious interference with a business expectancy, and (4) violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., with each count directed to one of CRDA, HSG, Data-Mail, Inc., or the various individual defendants. See footnote 2 of this opinion. In support of these counts, the plaintiff alleged that the RFP was a "sham . . . process" intended to conceal the defendants' collective scheme to ensure that HSG was awarded a contract to redevelop the stadium.

In addition, in support of each count of its complaint, the plaintiff alleged that the defendants' misconduct

caused it harm in the form of (1) costs and fees it incurred in developing its RFP submission and (2) lost profits that would have resulted "from its successful bid that rightfully belonged to it." As relief, the plaintiff sought (1) money damages against all of the defendants, except for the city, (2) injunctive relief (a) prohibiting any additional development of the stadium, (b) voiding the agreement between the city and HSG, and (c) ordering a new procurement, conducted under the proper procedures, to develop the stadium, and (3) any additional relief deemed just and proper by the court.

On May 23, 2022, motions to dismiss the plaintiff's complaint, accompanied by memoranda of law and exhibits, were filed by, respectively, (1) the city, Bronin, Sean Fitzpatrick, Glendowlyn Thames, and Julio Concepcion (collectively, city defendants),[11] (2) CRDA, Hart, Andy Bessette, Suzanne Hopgood, Anthony Lazzaro, David Jorgensen, Michael Matteo, and Marcia Leclerc (collectively, CRDA defendants),[12] (3) HSG, Mandell, Calafiore, Schooley, and Data-Mail, Inc. (collectively, HSG defendants),[13] and (4) Freimuth.[14] The

---

[11] The plaintiff alleged that (1) Bronin was the city's mayor and, prior to the beginning of his tenure as the city's mayor, a partner at Hinckley Allen, (2) Fitzpatrick was a CRDA board member and the city's director of development services, (3) Thames was a CRDA board member and the president of the council, and (4) Concepcion was a state representative and a former council majority leader.

[12] The plaintiff alleged that (1) Hart was a CRDA board member and CRDA's venue director, (2) Bessette was a CRDA board member and CRDA's venue committee chair, (3) Hopgood was a CRDA board member and CRDA's board chair, (4) Lazzaro was a CRDA board member and CRDA's deputy director and general counsel, (5) Jorgensen and Matteo were CRDA board members and served on CRDA's venue committee, and (6) Leclerc was a CRDA board member and the chairwoman of CRDA's venue committee.

[13] The plaintiff alleged that (1) Mandell was the president of Data-Mail, Inc., and a co-owner of HSG, (2) Calafiore and Schooley were partnered with Mandell and were co-owners of HSG, and (3) Data-Mail, Inc., was "indistinguishable from . . . HSG in terms of operation, personnel, and funds such that the independence of the two corporations had never begun and adhering to the fiction of separate identities would only defeat justice and equity."

[14] The plaintiff alleged that Freimuth was a CRDA board member and CRDA's executive director. Freimuth did not join the motion to dismiss

defendants collectively claimed that the trial court lacked subject matter jurisdiction over the present action on the ground that the plaintiff did not have standing to raise claims concerning the award of a contract pursuant to the RFP because it had no legal or equitable right in any such contract. Insofar as the plaintiff sought money damages in connection with its remaining claims, the defendants further collectively asserted that the plaintiff lacked standing to claim such damages.[15] On July 7, 2022, the plaintiff filed memoranda of law in opposition to the defendants' respective motions to dismiss, along with appended exhibits, and, on July 29, 2022, reply briefs were filed by, respectively, the city defendants, the CRDA defendants, the HSG defendants, and Freimuth.

On August 31, 2022, the court, *Farley, J.*, heard argument on the motions to dismiss. On December 7, 2022, the court ordered the parties to file simultaneous supplemental briefs to address further the applicability of the code to the RFP, which supplemental briefs were filed on January 6, 2023.

On May 4, 2023, the court issued a memorandum of decision granting the defendants' respective motions to dismiss on the ground that the plaintiff lacked standing. The court first concluded that, insofar as the plaintiff was seeking declaratory and injunctive relief, the plaintiff lacked standing because, as the defendants argued, its claims "rest[ed] upon the core allegation that it participated in a government procurement process and was not awarded a contract." Quoting *Ardmare Construction Co.* v. *Freedman*, 191 Conn. 497, 502, 467 A.2d

filed by the CRDA defendants but, instead, filed a separate motion to dismiss. On May 24, 2022, Freimuth filed a corrected memorandum of law accompanying his motion to dismiss.

[15] Additionally, (1) the defendants collectively claimed that the plaintiff's claims were moot and (2) the individual CRDA defendants and Freimuth claimed that they were entitled to statutory immunity pursuant to General Statutes § 1-125.

674 (1983), the court determined that "[a]n unsuccessful bidder 'has no legal or equitable right in the contract . . . [and] no right to judicial intervention.' " The court then rejected an argument raised by the plaintiff that its allegations of fraud and favoritism in the RFP process afforded it standing, concluding that (1) there is a limited exception to the rules of standing that enables an unsuccessful bidder in a government procurement process *that is subject to competitive bidding laws* to present claims regarding the award of a public contract "where fraud, corruption or acts undermining the objective and integrity of the bidding process existed"; (internal quotation marks omitted); but (2) the RFP was not subject to the competitive bidding requirements of either § 4b-91 or § 2-548 of the code, and the plaintiff cited no authority to support the proposition that an unsuccessful bidder in a government procurement process that is *not* governed by competitive bidding laws may challenge the award of a government contract by alleging fraud or favoritism. The court further concluded that the plaintiff lacked standing to pursue its remaining claims for money damages against the CRDA defendants, Freimuth, the HSG defendants, and the individual city defendants.[16] This appeal followed.[17] Additional facts and procedural history will be set forth as necessary.

On appeal, the plaintiff asserts that the court improperly concluded that it lacked standing to bring its claims

---

[16] In a footnote, citing *Blesso Fire Systems, Inc.* v. *Eastern Connecticut State University*, 245 Conn. 252, 713 A.2d 1283 (1998), the court further concluded that, "[e]ven if the RFP [were] subject to competitive bidding requirements, the plaintiff's claims for equitable relief are moot because the [RFP] process was abandoned and no contract for the redevelopment and operation of [the stadium] was awarded to an RFP participant." The court briefly iterated this conclusion at the end of its decision. The court declined to reach any other alternative grounds for dismissal that the defendants had raised in their respective motions to dismiss.

[17] On May 24, 2023, pursuant to General Statutes § 52-265a, the plaintiff filed an application for certification to appeal with our Supreme Court, which application was denied on May 31, 2023.

against the defendants.[18] The plaintiff maintains that, contrary to the court's determinations, (1) the RFP was subject to the competitive bidding requirements of (a) § 4b-91 and (b) § 2-548 of the code, such that it had standing to assert its claims seeking injunctive and declaratory relief on the basis of its allegations that the RFP process was marred by fraud and favoritism, and (2) it had standing to assert its other claims against the defendants, other than the city, seeking money damages.[19] We disagree.

Before addressing the merits of the plaintiff's claims, we set forth the governing standard of review. "A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction. . . . [O]ur review of the court's ultimate legal conclusion and resulting [determination] of the motion to dismiss will be de novo. . . . In undertaking this review, we are mindful of the well established notion that, in determining whether a court has subject matter jurisdiction, every presumption favoring jurisdiction should be indulged. . . .

"Our courts have acknowledged that [t]rial courts addressing motions to dismiss for lack of subject matter jurisdiction . . . may encounter different situations,

---

[18] The plaintiff also claims that the court improperly concluded that its claims were moot on the basis of its determinations that the RFP had been "abandoned and no contract for the redevelopment and operation of [the stadium] was awarded to an RFP participant." See footnote 16 of this opinion. Additionally, two alternative grounds for affirmance have been raised on appeal, namely, that (1) the plaintiff's claims were moot because the stadium has been fully developed and (2) the individual CRDA defendants and Freimuth are entitled to statutory immunity pursuant to General Statutes § 1-125. The plaintiff argues that these alternative grounds for affirmance are without merit. Our conclusion that the court properly dismissed the plaintiff's complaint for lack of standing is dispositive of this appeal, and, therefore, we need not address either the court's mootness analysis or the alternative grounds for affirmance.

[19] For ease of discussion, we address the plaintiff's claims in a different order than that in which they are set forth in its principal appellate brief.

depending on the status of the record in the case. . . . [L]ack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. . . . Different rules and procedures will apply, depending on the state of the record at the time the motion is filed. When a trial court decides a jurisdictional question raised by a pretrial motion to dismiss on the basis of the complaint alone, it must consider the allegations of the complaint in their most favorable light. . . . In this regard, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader. . . .

"In contrast, if the complaint is supplemented by undisputed facts established by affidavits submitted in support of the motion to dismiss . . . [or] other types of undisputed evidence . . . the trial court, in determining the jurisdictional issue, may consider these supplementary undisputed facts and need not conclusively presume the validity of the allegations of the complaint. . . . Rather, those allegations are tempered by the light shed on them by the [supplementary undisputed facts]. . . . If affidavits and/or other evidence submitted in support of a defendant's motion to dismiss conclusively establish that jurisdiction is lacking, and the plaintiff fails to undermine this conclusion with counteraffidavits . . . or other evidence, the trial court may dismiss the action without further proceedings." (Citations omitted; internal quotation marks omitted.) *Fountain of Youth Church, Inc.* v. *Fountain*, 225 Conn. App. 856, 867–68, 317 A.3d 106 (2024). In the present case, no additional proceedings to resolve contested jurisdictional facts were requested or conducted;

rather, as the court stated, it "consider[ed] the allegations of the complaint, construed favorably to the plaintiff, as well as the affidavits and documents submitted by the parties to the extent they reflect[ed] undisputed facts."

The dispositive issue on appeal is whether the court properly concluded that the plaintiff lacked standing to pursue its claims against the defendants. "A trial court's determination of whether a plaintiff lacks standing is a conclusion of law that is subject to plenary review on appeal. . . . The question of whether a party has standing to bring an action implicates the court's subject matter jurisdiction. . . . Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . When standing is put in issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication of the issue . . . . Standing requires no more than a colorable claim of injury; a [party] ordinarily establishes . . . standing by allegations of injury [that he or she has suffered or is likely to suffer]. Similarly, standing exists to attempt to vindicate arguably protected interests. . . .

"Standing is established by showing that the party claiming it is authorized by statute to bring suit or is classically aggrieved. . . . The fundamental test for determining [classical] aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in [the subject matter of the challenged action], as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming

aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the [challenged action]. . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Citation omitted; internal quotation marks omitted.) *Martinelli* v. *Martinelli*, 226 Conn. App. 563, 572–73, 319 A.3d 198 (2024).

I

We first address the plaintiff's claim that the trial court improperly determined that the RFP was not governed by the competitive bidding requirements of (1) § 4b-91 or (2) § 2-548 of the code, such that the plaintiff lacked standing to assert its claims for declaratory and injunctive relief. This claim fails.

"As a matter of common law, an unsuccessful bidder on a state or municipal contract has no contractual right that would afford standing to challenge the award of a contract. [A] bid, even the lowest responsible one, submitted in response to an invitation for bids is only an offer which, until accepted . . . does not give rise to a contract between the parties. . . . An unsuccessful bidder, therefore, has no legal or equitable right in the contract. Not unlike any other person whose offer has been rejected, the disappointed bidder has no right to judicial intervention. . . .

"Moreover, no statute grants unsuccessful bidders standing to challenge the award of a state contract. . . . In particular, state and local competitive bidding laws have not been enacted in order to protect bidders. These laws serve to guard against abuses in the award of contracts such as favoritism, fraud or corruption and are enacted solely for the benefit of the public and in no sense create any rights in those who submit bids. . . .

"Despite these substantial constraints, we have recognized a limited exception to the rules of standing in order to provide a means of protecting the public's interest in properly implemented competitive bidding processes." (Citations omitted; internal quotation marks omitted.) *Connecticut Associated Builders & Contractors* v. *Hartford*, 251 Conn. 169, 178–79, 740 A.2d 813 (1999). Specifically, judicial intervention is proper "only where fraud, corruption or favoritism has influenced the conduct of the bidding officials or when the very object and integrity of the competitive bidding process is defeated by the conduct of [the bidding] officials." *Spiniello Construction Co.* v. *Manchester*, 189 Conn. 539, 544, 456 A.2d 1199 (1983). As our Supreme Court has further explained, "[i]n [*Spiniello Construction Co.*], we recognized that our prior decisions had the effect of preventing judicial review of potentially meritorious claims concerning the implementation and execution of competitive bidding statutes. We also acknowledged the fact that the group most benefitted by the statute—the public—had no effective means of protecting their interests. We substantially adopted the position . . . that [t]he public interest in preventing the granting of contracts through arbitrary or capricious action can properly be vindicated through a suit brought by one who suffers injury as a result of the illegal activity, but the suit itself is brought in the public interest by one acting essentially as a private attorney general. . . . Thus, we held that where fraud, corruption or acts undermining the objective and integrity of the bidding process existed, an unsuccessful bidder did have standing under the public bidding statute [at issue]." (Citations omitted; internal quotation marks omitted.) *Ardmare Construction Co.* v. *Freedman*, supra, 191 Conn. 504–505. "Our policy to limit standing so as to deny some claims brought by unsuccessful and precluded bidders is designed to protect

twin goals that serve the public interest in various, sometimes conflicting, ways. The standing rules aim to strike the proper balance between fulfilling the purposes of the competitive bidding statutes and preventing frequent litigation that might result in extensive delay in the commencement and completion of government projects to the detriment of the public." (Internal quotation marks omitted.) *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 180.

Pursuant to the foregoing legal principles, the plaintiff had no standing to assert claims predicated on the fact that it was not awarded a contract flowing from the RFP, unless the aforementioned limited exception to the standing rules applied. This limited exception, however, contemplates the existence of a *competitive* bidding process, the integrity of which has been compromised. See id., 179 ("we have recognized a limited exception to the rules of standing in order to provide a means of protecting the public's interest in properly implemented *competitive bidding processes*" (emphasis added)); *Spiniello Construction Co.* v. *Manchester*, supra, 189 Conn. 544 (judicial intervention is proper "only where fraud, corruption or favoritism has influenced the conduct of the bidding officials or when the very object and integrity of the *competitive bidding process* is defeated by the conduct of [the bidding] officials" (emphasis added)). Thus, notwithstanding the plaintiff's allegations of fraud and favoritism vis-à-vis the RFP, the threshold inquiry is whether the RFP was subject to the statutory or municipal competitive bidding requirements at issue. For the reasons that follow, we agree with the trial court and conclude that neither the statutory nor municipal competitive bidding requirements applied to the RFP.

These claims require us to interpret statutory and municipal ordinance provisions, thereby raising questions of statutory interpretation subject to plenary

review. See *Townsend* v. *Commissioner of Correction*, 226 Conn. App. 313, 331, 317 A.3d 1147 (2024) (interpretation of statutes raises question of law requiring exercise of plenary review); *Mention* v. *Kensington Square Apartments*, 214 Conn. App. 720, 729–30, 280 A.3d 1195 (2022) (interpretation of ordinances raises question of law requiring exercise of plenary review). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . It is a basic tenet of statutory construction that [w]e construe a statute as a whole and read its subsections concurrently in order to reach a reasonable overall interpretation." (Citation omitted; internal quotation marks omitted.) *Townsend* v. *Commissioner of Correction*, supra, 331. The principles of statutory construction also apply to our examination of municipal ordinances. See *Mention* v. *Kensington Square Apartments*, supra, 730 ("[w]e interpret and construe local ordinances according to the principles of statutory interpretation" (internal quotation marks omitted)).

A

Turning our attention first to § 4b-91, the plaintiff maintains that the court incorrectly determined that the competitive bidding requirements of the statute did not apply to the RFP. We are not persuaded.

The pertinent statutory provision at issue is § 4b-91 (a), which provides in relevant part: "(2) Except as

provided in subdivision (3) of this subsection,[20] every contract for the construction, reconstruction, alteration, remodeling, repair or demolition of any public building or any other public work by the state that is estimated to cost more than one million dollars shall be awarded to the lowest responsible and qualified general bidder who is prequalified pursuant to section 4a-100 on the basis of competitive bids in accordance with the procedures set forth in this chapter, after the awarding authority has invited such bids by posting notice on the State Contracting Portal. The awarding authority shall indicate the prequalification classification required for the contract in such notice. . . .

"(4) Every contract for the construction, reconstruction, alteration, remodeling, repair or demolition of any public building or any other public work by a public agency that is paid for, in whole or in part, with state funds and that is estimated to cost more than one million dollars shall be awarded to a bidder that is prequalified pursuant to section 4a-100 after the public agency has invited such bids by posting notice on the State Contracting Portal . . . . The awarding authority or public agency, as the case may be, shall indicate the prequalification classification required for the contract in such notice. . . ." (Footnote added.)

In concluding that § 4b-91 did not apply to the RFP, the court reasoned that the RFP did not seek bids for " 'the construction, reconstruction, alteration, remodeling, repair or demolition of' [the stadium]" or "specify any 'other public work' to be performed" but, instead, "sought submissions by persons 'interested in using, redeveloping and operating [the stadium].' . . . Rather than asking the respondents to bid on a proposed use, redevelopment and operation of the [stadium], the RFP

---

[20] We note that subdivision (3) of § 4b-91 (a) is not relevant to the facts of this case.

asked the respondents to submit their own proposals for the use, redevelopment and operation of the [stadium] and expressed a preference for proposals that included a professional sports team. There were only the vaguest categories of submission requirements and none that were amenable to competitive bidding. In this open-ended format, the responses could not be expected to reflect the uniformity required for competitive bidding. The RFP made this clear by providing in its terms that '[i]ssuance of this RFP does not obligate CRDA or the city . . . to undertake any action.' Neither the city nor CRDA was committed to award a contract, and the RFP even reserved the right to use the respondents' submissions as a basis for negotiation with other respondents and nonrespondents on other terms." Moreover, the court observed that the RFP did not set forth a prequalification requirement. As the court summarized, "[s]imply stated, this was not a competitive bidding process contemplated by § 4b-91."

The plaintiff contests the court's determination that the RFP did not invite bids for "the construction, reconstruction, alteration, remodeling, repair or demolition" of the stadium or "any other public work . . . ."[21] (Internal quotation marks omitted.) The plaintiff maintains that "[t]he very purpose of the RFP . . . was to determine what materials and labor may be needed to meet the requested goals of construction, remodeling,

---

[21] The plaintiff relies on subdivision (2) of § 4b-91 (a) in asserting this argument, whereas the court, in its decision, cited subdivision (4) in concluding that the competitive bidding requirements of the statute were inapplicable. This discrepancy is of no moment. Both subdivisions concern contracts "for the construction, reconstruction, alteration, remodeling, repair or demolition of any public building or any other public work," as well as require bidders to be prequalified pursuant to General Statutes § 4a-100, with the awarding authority or the public agency, as the case may be, directed to indicate the necessary prequalification classification in a certain notice. General Statutes § 4b-91 (a) (2) and (4). As we conclude in this opinion, the RFP did not solicit bids for such contracts. For these reasons standing alone, neither subdivision applied to the RFP.

and repair of [the stadium], along with other types of 'public work.'" In support of its position, the plaintiff points out that the RFP (1) provided facts regarding the stadium, including size, turf type, bleacher seating, and parking, (2) specified that one of the five project goals was "[p]rovid[ing] for the upgrade and repair of the [s]tadium," while identifying necessary renovations that included upgrading the playing field, replacing or refurbishing the bleachers, and upgrading the lighting and sound systems, (3) directed respondents to propose budgets and descriptions of "'capital improvements necessary'" for the identified uses, as well as the sources of funding for such improvements, and (4) included an aerial photo, site photos, and a site plan. Additionally, the plaintiff discounts the court's reliance on the absence of a prequalification requirement in the RFP, contending that the lack of such a requirement "does not invalidate the RFP entirely, but only indicates how improperly CRDA conducted the RFP to begin with."

Having carefully reviewed the RFP, we conclude that the RFP did not fall within the ambit of § 4b-91. The RFP did not solicit bids for work to be performed on the stadium in accordance with an established plan with comprehensive specifications for respondents to utilize in developing their submissions; instead, the RFP invited respondents to submit their own proposed plans, taking into account baseline criteria identified in the RFP, for the redevelopment of the stadium. Put another way, the RFP did not invite respondents to bid on a contract for "the construction, reconstruction, alteration, remodeling, repair or demolition of any public building or any other public work"; General Statutes § 4b-91 (a) (2) and (4); but, rather, sought proposed plans that potentially would serve as the bedrock for the future redevelopment of the stadium. Our conclusion is further bolstered by the RFP's provisions that (1) the

issuance of the RFP "[did] not obligate CRDA or the [c]ity . . . to undertake any action" or "commit CRDA or the [c]ity . . . to award a contract" and (2) CRDA reserved the right to use RFP submissions in negotiations with other respondents and/or others who did not respond to the RFP, as such provisions are not indicative of a solicitation governed by the competitive bidding requirements of § 4b-91 (a). Moreover, the RFP made no mention of the prequalification requirement that would apply were it subject to the statutory competitive bidding provisions, which further informs our analysis and weighs in favor of interpreting the RFP to fall outside of the scope of § 4b-91 (a).[22]

In sum, we conclude that the court properly determined that the RFP was not subject to the competitive bidding requirements of § 4b-91.

B

We next consider the plaintiff's contention that the court incorrectly determined that the competitive bidding requirements of § 2-548 of the code did not apply to the RFP. This contention also fails.

Section 2-546 of the code, titled "Methods of source selection," provides in relevant part that, "[u]nless otherwise authorized by the Charter of the City or this Code, all Contracts . . . shall be awarded by one (1) of the following methods: (A) Competitive Offers as set forth in Section 2-548 of this Article, which shall include competitive bidding and competitive proposals . . . ." Section 2-548 of the code, titled "Competitive solicitations," provides in relevant part: "(A) *Conditions for*

---

[22] The plaintiff asserts that, "[e]ven if the RFP [were] not a 'competitive bid,' the very nature of the services requested required that CRDA and the city follow § 4b-91." (Emphasis omitted.) As we have concluded, however, the RFP sought proposed plans created by respondents for the stadium's redevelopment. In other words, the RFP did not request "services" to be performed, beyond the submission of proposed redevelopment plans.

*use.* All Agreements, in an amount in excess of the twenty-five thousand dollars ($25,000.00) threshold established by the Charter of the City, shall be awarded through the competitive solicitation process established under this Article . . . .” “Agreement” is defined by the code to mean “an arrangement between the City and other parties regarding a course of action set out in a Contract, Purchase Order[23] or memorandum of understanding.” (Footnote added.) Hartford Municipal Code § 2-537 (B). “Contract” is defined by the code in relevant part as “a written arrangement between the City and other competent parties to perform or not to perform specific work[24] pertaining to Services and Professional Services[25] or as otherwise set forth in this

[23] “Purchase orders” are defined by the code in relevant part to mean “dual purpose instruments which may serve as: (1) A commercial agreement documenting a purchase transaction for the acquisition of Commodities, Services or Construction Items, in accordance with the requirements of this Article and the Regulations and Policies, as proposed by the Purchasing Agent, and a financial tool evidencing the encumbrance of funds and authorization or notice to proceed, if specifically set forth, for the transaction in question. . . .

“(2) A financial tool only for the encumbrance of funds for a transaction and/or authorization or notice to proceed, in support of other forms of agreement, under circumstances as determined in the sole discretion of the Purchasing Agent. . . .” Hartford Municipal Code § 2-537 (FF).

[24] “Work” is defined by the code to mean “all the effort necessary to provide the Commodities and Services necessary to effectuate the terms of any Agreement under this Article.” Hartford Municipal Code § 2-537 (RR).

[25] “Services or contractual services” is defined by the code in relevant part to mean “the furnishing of labor, time, or effort by a Contractor, not involving the delivery of a specific end product other than reports, which are merely incidental to the required performance. . . . Moreover, this term shall include services for which a Contractor is conferred a benefit by the City, whether or not compensated by the City. . . .” Hartford Municipal Code § 2-537 (MM).

“Contractor” is defined by the code in relevant part to mean “any person having a Contract or Purchase Order with the City or any of its Agencies. . . .” Id., § 2-537 (I).

“Professional services” is defined by the code in relevant part to mean “any infrequent, technical and/or unique functions performed by independent contractors whose occupation is the rendering of such services. . . .” Id., § 2-537 (BB).

Chapter. . . . Whenever the term 'Agreement' is used in this Chapter it shall mean a Contract, Purchase Order or memorandum of understanding depending on the context. . . ." (Footnotes added.) Id., § 2-537 (H).

Subsection (B) of § 2-548 of the code, titled "Request for response," provides in relevant part: "A Request for Response shall be issued and shall include Specifications,[26] Scope of Services, System Requirements or any other descriptions of the Commodity,[27] Service, Construction[28] or Lease, and all proposed and/or mandatory contractual terms, special terms and conditions applicable to the Procurement,[29] other legal and regulatory requirements. . . ." (Footnotes added.) "Request for response" is defined by the code as "any competitive

[26] "Specification" is defined by the code to mean "a detailed written description of the physical or functional characteristics, or of the nature of a Commodity, Service or Construction Item. It may include a description of any requirement for inspecting, testing, or preparing a Commodity, Service or Construction Item for delivery. Said Specifications are to be attached to or, otherwise, made a part of the solicitation." Hartford Municipal Code § 2-537 (OO).

[27] "Commodities" is defined by the code to mean "an article of trade, a movable article of value, something that is bought or sold; any movable or tangible thing that is produced or used as the subject of barter or sale. When used alone the term 'Commodities' shall include equipment, materials and supplies." Hartford Municipal Code § 2-537 (F).

[28] "Construction" is defined by the code to mean "the process of building, altering, repairing, improving, or demolishing any Infrastructure Facility, including any public structure, public building, or other public improvements of any kind to City property or other property or space in which the City has an interest. It does not include the routine operation, routine repair, or routine maintenance of any existing Infrastructure Facility, including structures, buildings or real property." Hartford Municipal Code § 2-537 (G).

[29] "Procurement" is defined by the code to mean in relevant part "buying, purchasing, renting, leasing, or otherwise acquiring any Commodities, Services, real or personal property or Construction or obtaining a benefit from the City even in the event the City is not responsible for compensation. It also includes all functions that pertain to the obtaining of any Commodity, Service, property or Construction, including description of requirements, selection and solicitation of sources, preparation and award of a Contract or Purchase Order, and all phases of contract administration. . . ." Hartford Municipal Code § 2-537 (AA).

process utilized for soliciting a response. A Request for Response may be in the form of a Request for Bid, Request for Proposals or other solicitation method and includes all associated documents, whether attached or incorporated by reference." Hartford Municipal Code § 2-537 (KK).

In concluding that the code did not apply to the RFP, the court determined that "[t]he RFP did not seek proposals to perform 'specific work' under a contract as contemplated by § 2-537 (H) [of the code]. The RFP asked respondents to provide specifications such as proposed uses, cost estimates and sources of funding, rather than itself providing a 'detailed written description' of specifications to the respondents, in accordance with §§ 2-537 (OO) and 2-548 (B) [of the code], and asking respondents for a price. The process did not seek the provision of goods or services within established, detailed specifications, and request respondent bids from which the city would award a contract to a respondent. Hartford [Municipal] Code § 2-548."

The court also observed that, although " 'competitive negotiation[s]' " were authorized under the code, such negotiations "presuppos[ed] the existence of a 'competitive solicitation' under § 2-548 [of the code]. It is not an alternative to that process." The court further stated that, "while the RFP reference[d] CRDA's right to negotiate with the respondents after receipt of their responses, it [went] much further . . . and reserve[d] CRDA's right to use respondents' submissions as a basis for negotiating with nonrespondents."

Additionally, the court determined that the contracts executed following the RFP did not support the plaintiff's position that the RFP was subject to the competitive bidding requirements of the code. The court stated that (1) the term sheet contemplated (a) a license agreement between the city and CRDA for the operation

and use of the stadium and (b) a sublicense agreement between CRDA and HSG to enable HSG to utilize the stadium to operate a professional soccer team, (2) the city and CRDA entered into the 2018 license agreement, but CRDA never executed a license agreement with HSG, and (3) "on the strength of the term sheet, HSG made substantial investments to support the redevelopment of the stadium and on February 25, 2019, the HSG created entity, Hartford Athletic, [LLC] obtained a license directly from the city to use the stadium . . . and acquired the right to name the stadium." The court continued: "The fact that these license agreements ultimately materialized sometime after the RFP process does not retroactively transform the RFP into a competitive solicitation under . . . § 2-548 [of the code] or . . . § 4b-91. The undisputed fact is that following the RFP process and CRDA's suggestion that the city negotiate with HSG to redevelop [the stadium], the city and CRDA decided to go in a different direction and have CRDA oversee the redevelopment of the stadium. The city and CRDA entered into [the 2018] license agreement entrusting CRDA . . . with that responsibility. As the [board] concluded [in the 2020 final report], CRDA and the city 'essentially abandoned' the RFP.

"The plaintiff focuses specifically on the [2019 stadium use agreement] between the city and Hartford Athletic, [LLC], but that agreement bears no resemblance to a contract to redevelop and operate [the stadium]. Nor is it governed by . . . § 4b-91 because it does not involve the 'construction, reconstruction, alteration, remodeling, repair or demolition' of [the stadium]. Nor is it an 'Agreement' under . . . § 2-537 (B) [of the code] because it does not involve the provision of any services to the city for a price paid by the city . . . . The [2018] license [agreement] with CRDA and [the 2019 stadium use agreement with] Hartford Athletic, [LLC], were not contracts subject to competitive

bidding laws and were not the product of the RFP process, which, as the [board] concluded, the city and CRDA abandoned." (Citation omitted.)

As the court summarized, "CRDA and the city implemented a process that essentially reversed the role of the parties by seeking proposals from the respondents that would help establish the scope of work and how it could be financed." The court continued: "[T]he RFP . . . was not intended to constitute a 'competitive solicitation' within the scope of the city's procurement ordinances. At most, [the RFP] may have facilitated future competitive processes related to the redevelopment of [the stadium], such as those that CRDA subsequently implemented to procure the reconstruction of the stadium."[30]

The plaintiff asserts that, contrary to the court's determination, the RFP was a "competitive solicitation" under the code because (1) the RFP solicited bids for an "Agreement," as defined in the code, in excess of $25,000, (2) the RFP satisfied the "minimum requirements" to constitute a "Request for Response" under the code, as it delineated (a) "details necessary for a competitor to develop a plan for the stadium's development," (b) the project's five goals, and (c) additional details about, inter alia, information respondents had to provide in their submissions and how a successful respondent would be selected, (3) the code incorporates " 'negotiating' " into the bidding process, such that

---

[30] In the 2020 final report, the board suggested that CRDA should have considered issuing a Request for Information (RFI), rather than the RFP, if the RFP was intended to be an "advisory exercise." The court noted that the board's advice "ha[d] merit"; however, the court concluded that, "even if inaptly named," the RFP did not constitute a competitive solicitation under the code. The plaintiff maintains on appeal that, pursuant to the code, CRDA and the city could have issued an RFI if they were not seeking to initiate a competitive bidding process. For the reasons set forth in part I B of this opinion, we agree with the court that, although the RFP may have been "inaptly named," it nevertheless did not fall within the ambit of the code's competitive bidding requirements.

the RFP's terms concerning negotiation did not militate against the RFP being construed as a competitive bidding process, and (4) following the RFP, contracts were executed providing for the redevelopment of the stadium by HSG, with "HSG . . . [beginning] construction and work on [the stadium] based on contracts issued by the city—contracts whether verbal or written—and which amounted to over $10 million in taxpayer money." We are not persuaded.

The plaintiff's first two contentions are unavailing for the same reasons that we set forth in part I A of this opinion in support of our conclusion that the RFP was not subject to the competitive bidding requirements of § 4b-91. In short, the RFP did not invite bids for a contract entailing "specific work" to be performed in accordance with a developed plan accompanied by "[s]pecifications" to be utilized by respondents in preparing their bids; Hartford Municipal Code §§ 2-537 (H) and 2-548 (B); rather, as the court determined, "CRDA and the city implemented a process that essentially reversed the role of the parties by seeking proposals from the respondents that would help establish the scope of work and how it could be financed."

Additionally, we reject the plaintiff's proposition that the negotiation provisions of the RFP weigh in favor of construing the RFP to be governed by the municipal bidding requirements of the code. Section 2-549 (A) of the code, titled "Competitive negotiations with Candidates and revisions to offers," provides: "As provided in the request for response and under regulations or policies, discussions may be conducted, by the Purchasing Agent or a Designee, with the participation of the Using Agency, where practicable, with Candidates who submit responses determined to be reasonably susceptible of being selected for award for the purpose of refinement and clarification to assure full understanding of, and responsiveness to, the solicitation requirements."

As the court recognized, the RFP did not merely allow for negotiations with RFP respondents; instead, it authorized CRDA to use RFP submissions to negotiate with one or more respondents, as well as with entities that did not submit proposals in response to the RFP. Thus, as the court determined, the RFP's negotiation terms were more expansive than the provisions of § 2-549 (a) of the code. This distinction bolsters our conclusion that the RFP was not subject to the code's competitive bidding requirements.

The plaintiff's final contention is that contracts were executed following the RFP for the redevelopment of the stadium by HSG, which illustrated that the RFP was a competitive bidding process under the code.[31] The plaintiff maintains that the written contracts that followed the RFP were subject to the code's competitive bidding requirements. We disagree. The record contains undisputed evidence that (1) the city and CRDA (a) executed the 2018 license agreement, pursuant to which the city entrusted CRDA with the responsibility of managing the redevelopment of the stadium, and (b) later executed the 2019 stadium renovation and operation agreement, which was amended on February 1, 2022, and which contained the "detailed terms and conditions" governing CRDA's renovation and operation of

---

[31] The plaintiff raises this claim in the section of its principal appellate brief addressing the court's determination that the RFP was not governed by the code's competitive bidding requirements; however, in its reply briefs to the appellate briefs filed by the city defendants and the HSG defendants, respectively, the plaintiff appears to rely on the contracts executed following the RFP to challenge the court's determination that the RFP was not subject to § 4b-91, as well. The court determined that the contracts executed following the RFP did not establish that the RFP was a competitive bidding process under either § 4b-91 or the code. Assuming that the plaintiff's claim properly encompasses the court's reasoning regarding the statutory competitive bidding requirements, our rationale for rejecting this claim vis-à-vis the code's competitive bidding requirements applies equally to reject this claim as to the statutory competitive bidding requirements.

the stadium, including CRDA's duty to enter into construction agreements for the purpose of redeveloping the stadium, and (2) the city and Hartford Athletic, LLC, a nonparty to this action that is owned by HSG, executed the 2019 stadium use agreement, pursuant to which the city authorized Hartford Athletic, LLC, to utilize the stadium to play professional soccer games.[32] Nothing in the terms of these contracts provided for HSG to redevelop the stadium. Moreover, although these contracts detailed CRDA's obligation to manage the stadium's redevelopment, they did not involve the performance or nonperformance of "specific work pertaining to Services and Professional Services or as otherwise set forth in [chapter 2 of the code]," and, therefore, did not constitute "Contract[s]," as defined by the code. Hartford Municipal Code § 2-537 (H); see also id., §§ 2-546 (A) and 2-548 (A). Similarly, these contracts were not "Agreement[s]" governed by the code's competitive bidding requirements because they did not constitute "arrangement[s] between the City and other parties regarding a course of action set out in a Contract"; id., § 2-537 (B); or, as we have explained, meet the definition of "Contract[s]" under the code. See id., § 2-537 (H); see also id., § 2-548 (A). In summation, these contracts were not awarded through the code's competitive bidding procedures,[33] and, therefore, they do not provide support for the plaintiff's position that the RFP was a competitive bidding process under the code.

---

[32] Copies of these contracts were appended to the city defendants' memorandum of law in support of their motion to dismiss.

[33] The board, in essence, reached the same conclusion in the 2020 final report, stating in relevant part: "Since . . . Mandell and [HSG] had an interest in bringing a Tier 2 professional soccer team to a renovated . . . stadium, why not just license the use of the stadium to [HSG]? Why not allow CRDA to do what it does best which is to renovate and redevelop [the] stadium and the surrounding area? In the end, this is what actually occurred here. Why the charade of an RFP and a convoluted procurement process? This question is not answered by this report but may be best left to the [l]egislature and others in the [e]xecutive branch to answer or remedy a solution."

The plaintiff further claims that, in its complaint, it alleged that contracts, whether written or oral, were executed following the RFP providing for HSG to redevelop the stadium, which allegations were unrebutted by the defendants and supported by evidence submitted in connection with the defendants' respective motions to dismiss. We are not persuaded.

In addressing the plaintiff's arguments, we remain mindful that when, as in the present case, "the complaint is supplemented by undisputed facts established by affidavits submitted in support of the motion to dismiss . . . [or] other types of undisputed evidence . . . the trial court, in determining the jurisdictional issue, may consider these supplementary undisputed facts and need not conclusively presume the validity of the allegations of the complaint. . . . Rather, those allegations are tempered by the light shed on them by the [supplementary undisputed facts]. . . . If affidavits and/or other evidence submitted in support of a defendant's motion to dismiss conclusively establish that jurisdiction is lacking, and the plaintiff fails to undermine this conclusion with counteraffidavits . . . or other evidence, the trial court may dismiss the action without further proceedings." (Internal quotation marks omitted.) *Fountain of Youth Church, Inc.* v. *Fountain*, supra, 225 Conn. App. 868.

In its complaint, the plaintiff alleged that, "[o]n February 29, 2019 . . . the city . . . and HSG executed the contracts for the development of [the stadium]"; however, this allegation is not entitled to a presumption of validity in light of the undisputed evidence in the record reflecting that the 2019 stadium use agreement, as opposed to a redevelopment contract, was executed by the city and Hartford Athletic, LLC, rather than with HSG, on February 25, 2019. Additionally, the plaintiff alleged that Mandell's self-reported complaint to the SEEC in 2018 represented that HSG and the city had

"entered into an agreement . . . to bring a professional soccer team to play at a municipal stadium . . . with [CRDA] to serve as an administrator for the project." (Internal quotation marks omitted.) Neither this allegation nor the self-reported complaint, a copy of which is part of the record, suggested that HSG was contractually charged with redeveloping the stadium; rather, the self-reported complaint reflected the plans, as contemplated by the term sheet, for HSG to operate a professional soccer team at the stadium. The plaintiff further alleged that, as the 2019 SAPA report found, CRDA improperly spent more than $4 million in bond funds "on . . . [s]tadium construction as CRDA advanced the construction of the stadium to Mandell's specifications despite not having executed contracts." As the plaintiff itself acknowledged, it was CRDA that managed the stadium's construction efforts, and nothing in this allegation implied that HSG was contracted to redevelop the stadium.[34] The plaintiff also alleged that the city and CRDA "wilfully proceeded with their predetermined plans for [the stadium], which now exists as a privatized soccer stadium managed by HSG." Again, nothing in this allegation reasonably can be construed to suggest that HSG was a party to a contract to redevelop the stadium. Finally, we note that the complaint contains numerous, general allegations that the city or CRDA awarded a contract to redevelop the stadium to HSG and that the city executed such a contract with

---

[34] The plaintiff appended to its memoranda of law in opposition to the defendants' respective motions to dismiss a personal affidavit of Clynch, who averred in relevant part that, in response to Freedom of Information Act requests, he had received "numerous emails documenting that . . . Calafiore, on behalf of HSG, during the time frame of 2017 through 2018 developed plans and estimates for renovating and constructing [the stadium]." Although the development of plans and estimates concerning the redevelopment of the stadium may be indicative of HSG's being involved in discussions as to how the stadium should be redeveloped, it does not suggest that HSG, in fact, contracted with the city to handle the redevelopment of the stadium as alleged by the plaintiff.

HSG. Even when viewed in the light most favorable to the plaintiff, these general allegations cannot reasonably be construed as asserting that any agreements beyond those in the record, regardless of whether they were memorialized in writing, were executed between the city and HSG to redevelop the stadium.[35] For these reasons, we conclude that the court properly determined that the RFP was not subject to the code's competitive bidding requirements.

To summarize, "[n]ot unlike any other person whose offer has been rejected"; (internal quotation marks omitted) *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 179; the plaintiff had no standing to seek judicial intervention stemming from its failure to be awarded a contract in connection with the RFP. Pursuant to the limited exception to the standing rules, the plaintiff's allegations of fraud and favoritism tainting the RFP process would have afforded it standing if the RFP were subject to the competitive bidding requirements of § 4b-91 and/or the code; however, such requirements did not apply to the RFP.

[35] Relatedly, the plaintiff contends that the court improperly found that CRDA had solicited bids for construction contracts vis-à-vis the stadium in April, 2018, which, the plaintiff posits, runs contrary to its unrebutted allegations and is unsupported by the record. As we have concluded, however, insofar as the plaintiff alleged that the city executed a contract with HSG for the redevelopment of the stadium, those allegations were tempered by the undisputed evidence in the record reflecting that the city contracted with CRDA to handle the redevelopment of the stadium and contracted with Hartford Athletic, LLC, by way of the 2019 stadium use agreement. In addition, in the 2020 final report, which the plaintiff attached as an exhibit to its memoranda of law in opposition to the defendants' respective motions to dismiss, the board found that, following an RFP process, CRDA selected a nonparty to the present action named "Newfield Construction" to perform the renovation work at the stadium. Furthermore, in both the 2019 stadium use agreement and the 2019 stadium renovation and operation agreement, the term "Contractor" is defined to mean "Newfield Construction, Inc." Thus, there was unrebutted evidence in the record reflecting that CRDA solicited bids and awarded a contract concerning the redevelopment of the stadium to a nonparty.

Accordingly, we conclude that the court properly dismissed, for lack of standing, the plaintiff's claims seeking injunctive and declaratory relief.

## II

The plaintiff also claims that the trial court improperly concluded that it lacked standing to pursue its claims seeking money damages against the individual city defendants, the CRDA defendants, Freimuth, and the HSG defendants.[36] We are not persuaded.

In dismissing the plaintiff's claims against the individual city defendants, the CRDA defendants, and Freimuth, the court stated that "[t]he plaintiff's claims . . . all seek money damages based on various common-law and statutory torts. The damages sought include both lost profits associated with the alleged lost opportunity to redevelop [the stadium] and the costs associated with responding to the RFP. While the plaintiff concedes that its standing to sue the city is limited to claims for injunctive relief, the plaintiff argues that its standing to pursue its money damages claims . . . is distinct from its standing to sue the city and CRDA. The plaintiff argues that these claims do not seek money damages based on a flawed bidding process, but rather for tortious acts that happened contemporaneously with the bidding process. This theoretical distinction is not borne out by the substance of the complaint. The claims for money damages . . . are cloaked in the elements of traditional tort claims, but there is no escaping the

---

[36] The plaintiff asserted claims of (1) fraud against CRDA, (2) civil conspiracy to commit fraud against (a) the individual city defendants, (b) the CRDA defendants, (c) Freimuth, and (d) the HSG defendants, (3) tortious interference with a business expectancy against (a) the individual city defendants, (b) the CRDA defendants, and (c) Freimuth, (4) civil conspiracy to commit tortious interference with a business expectancy against (a) the individual city defendants, (b) the CRDA defendants, (c) Freimuth, (d) HSG, and (e) Data-Mail, Inc., and (5) a violation of CUTPA against (a) Bronin and (b) the HSG defendants.

fact that they all center on one essential wrong—that the RFP was a sham. Whether the plaintiff was tortiously lured into a sham RFP or wrongfully deprived of the award of a redevelopment contract, all the claims arise directly out of a government solicitation process. The plaintiff cites no authority for the proposition that an unsuccessful bidder who lacks standing to sue the government agency responsible for the solicitation may nevertheless sue individual public officials and agencies who were involved in the process." (Internal quotation marks omitted.) In addition, relying on *Lawrence Brunoli, Inc.* v. *Branford*, 247 Conn. 407, 722 A.2d 271 (1999), the court determined that, even if the plaintiff had standing to pursue equitable relief, "there is no standing to assert claims for money damages arising out of the plaintiff's unsuccessful participation in a government procurement process."

The court further concluded that the plaintiff lacked standing to assert its claims against the HSG defendants, which claims "rest[ed] on the same essential core as the claims asserted against the other defendants, alleging that the HSG defendants participated in a sham procurement process with the preordained outcome that HSG would be chosen to redevelop [the stadium]." The court determined "that the HSG defendants' status as nongovernmental parties [did] not change the standing analysis. The only legal interest the plaintiff ha[d] in asserting claims arising out of a government procurement process is the public interest underlying the state and municipal bidding statutes and ordinances. . . . The limitations on standing afforded to unsuccessful bidders asserting claims against the soliciting governmental agency apply as well in the context of claims against competitors because the legal interest is the same. There is no legal interest in obtaining a public contract and the plaintiff's claims for money damages against the successful bidder seek to enforce such an

interest. Moreover, the policy concerns underlying the standing limitations applicable to claims against government entities are the same in this context. Affording standing to unsuccessful bidders for money damage claims against successful bidders interferes with the public's interest in the government procurement process. The standing limitations are intended to strike the proper balance between fulfilling the purposes of the competitive bidding statutes and preventing frequent litigation that might result in extensive delay in the commencement and completion of government projects to the detriment of the public. . . . Maintaining that balance requires circumscribing claims against successful bidders with the same limitations imposed upon claims against the awarding governmental entity." (Citations omitted; internal quotation marks omitted.)

The plaintiff asserts that, in dismissing the remaining claims at issue, the court relied on the "faulty premise that the [plaintiff] did not have standing because all [of] the claims flowed from the RFP. . . . [T]his conclusion did not properly evaluate the [plaintiff's] standing under the principles of classical aggrievement . . . ." The plaintiff maintains that if, as the court concluded, the RFP was not a competitive bidding process, then it was not an " 'unsuccessful bidder' " but, instead, "a traditional plaintiff that must establish classical aggrievement . . . ." The plaintiff further posits that it alleged that it suffered harm independent of the award of any contract following the RFP. Specifically, the plaintiff maintains that it alleged that all of the defendants fraudulently misrepresented the nature of the RFP process, including that it was a "true bidding process" with a contract being awarded to the " 'winning' bidder," thereby inducing it to submit a bid as part of a " 'sham' " RFP and causing it harm in the form of costs and fees that it had incurred in developing its bid. Additionally, with respect to its claim alleging a CUTPA

violation against Bronin, the plaintiff contends that it alleged that Bronin, while employed as an attorney for Hinckley Allen prior to his tenure as the city's mayor, learned of Clynch's plans to bring a professional soccer franchise to the city and used that information gleaned from his attorney-client relationship with the plaintiff to "undermine [the plaintiff's] position, leverage HSG's bargaining position, and then obtain state funds for the city . . . ." We do not agree.

"It is well established that the interpretation of pleadings is always a question of law for the court . . . . Our review of the trial court's interpretation of the pleadings therefore is plenary. . . . Furthermore, we long have eschewed the notion that pleadings should be read in a hypertechnical manner. Rather, [t]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically. . . . [T]he complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory [on] which it proceeded, and do substantial justice between the parties. . . . Our reading of pleadings in a manner that advances substantial justice means that a pleading must be construed reasonably, to contain all that it fairly means, but carries with it the related proposition that it must not be contorted in such a way so as to strain the bounds of rational comprehension." (Emphasis omitted; internal quotation marks omitted.) *Hepburn* v. *Brill*, 348 Conn. 827, 848, 312 A.3d 1 (2024).

Having carefully reviewed the plaintiff's complaint, we agree with the court that, notwithstanding the various legal theories asserted, the plaintiff's claims "all center[ed] on one essential wrong—that the RFP was a sham." (Internal quotation marks omitted.) In substance, the plaintiff alleged that the defendants against which it sought money damages engaged in conduct that tricked it into participating in a solicitation process

that, as a result of fraud and favoritism tarnishing it, did not result in a contract awarded in its favor. We are not persuaded by the plaintiff's attempts to deconstruct its claims. Whether the plaintiff was harmed as a result of lost profits or costs and expenses incurred in participating in the RFP, the root issue, as alleged in support of each count of the plaintiff's complaint, is that the plaintiff participated in the RFP and was not awarded a contract. As we determined in part I of this opinion, "[n]ot unlike any other person whose offer has been rejected"; (internal quotation marks omitted) *Connecticut Associated Builders & Contractors* v. *Hartford*, supra, 251 Conn. 179; the plaintiff had no standing to seek judicial intervention under the circumstances of this case.

In sum, we conclude that the court properly dismissed, for lack of standing, the plaintiff's remaining claims seeking money damages against the individual city defendants, the CRDA defendants, Freimuth, and the HSG defendants.

The judgment is affirmed.

In this opinion the other judges concurred.